## McKNIGHT v. UNITED STATES.

### (Circuit Court of Appeals, Sixth Circuit.   May 6, 1902.)

### No. 1,078.

1. CRIMINAL LAW—INSTRUCTIONS—BURDEN OF PROVING INTENT.

A charge in a criminal case, in which intent was an essential in-gredient of the offense, was erroneous, where, after correctly stating that the burden rested upon the government to prove such intent beyond a reasonable doubt, but that it might be inferred from the acts of the defendant, who was presumed to have intended the natural and prob-able consequences of his acts, it was further stated that, if the acts proven were such as to raise an inference of guilty intent, the burden was thrown upon defendant to rebut such inference by evidence suf-ficiently strong to satisfy the jury beyond a reasonable doubt that there was no guilty intent; and the error cannot be held harmless where the general instruction that the burden of proof rested on the government, and continued throughout the case, was qualified by the words, "subject to what will be thereafter said upon the question of proof of intent."

2. SAME—CONSTITUTIONAL RIGHTS OF DEFENDANT—DEMAND FOR PRODUCTION OF INCRIMINATING DOCUMENTS.

To permit a demand to be made on the defendant in a criminal case, in the presence of the jury, to produce a paper or document containing incriminating evidence against him, is a violation of the immunity se-cured to him by the fifth amendment to the constitution, providing that no person in any criminal case shall be compelled to be a witness against himself, even though no order for the production of the paper is made, and the demand is made solely because of its supposed neces-sity to authorize the introduction of secondary evidence.

3. SAME—REMARKS OF COURT OR COUNSEL — REFERENCE TO DEFENDANT'S RIGHT TO TESTIFY.

It is prejudicial error for the court or counsel to call to the attention of the jury, in a criminal case, in any manner, the right of the defendant, under the statute, to testify in his own behalf; and such an error can only be cured, if at all, by a clear and emphatic statement by the court that the jury are not permitted to attach any importance to the failure of the defendant to testify.  Such comment is not rendered harmless by the fact that the defendant does afterwards testify, since it virtually compels him to do so to avoid unfavorable inferences by the jury.

4. NATIONAL BANKS—EMBEZZLEMENT BY OFFICER—INSTRUCTIONS.

Under an indictment charging an officer of a national bank with em-bezzlement of its funds by causing money of the bank to be paid to persons known by him to be insolvent, for the purpose of bribery, and with intent to defraud the bank,—such payment being made under the guise of a loan, for which such persons executed their note to the bank, —the insolvency of such persons is an important consideration, going to the question of intent; and an instruction which, in effect, tells the jury that the question of their insolvency may be ignored, is misleading.

5. SAME—ELEMENTS OF OFFENSE—KNOWLEDGE AND CONSENT OF DIRECTORS.

An averment, in an indictment charging an officer of a national bank with embezzlement by paying out money on a note which he knew to be worthless, with intent to injure and defraud the bank, that the transaction was without the knowledge or consent of the directors or the discount committee, need not be specifically proved, where the trans-action which the evidence tends to prove was one to which it cannot be presumed the directors or committee would consent; but in such case, if consent is relied on, it must be proved as matter of defense, and by evidence showing that it was given in good faith and with knowledge of the facts.

---

¶ 5. See Banks and Banking, vol. 6, Cent. Dig. § 973.

In Error to the District Court of the United States for the Western District of Kentucky.

See 97 Fed. 208; 113 Fed. 450.

A. E. Richards and W. C. P. Breckinridge, for plaintiff in error.

R. D. Hill, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge. This case having been before this court upon former writs of error, it is unnecessary to state in detail the facts upon which it depends. McKnight v. U. S., 38 C. C. A. 115, 97 Fed. 208; Id., 49 C. C. A. 594, 111 Fed. 735. We shall proceed to notice some of the assignments of error:

1. Upon the question of the burden of proof to establish the intent of the accused to defraud the bank in doing the acts charged, the court, in response to a request of the defendant, gave the charge as follows:

"On motion of the defendant the court instructs the jury that intent is a fact to be proved as any other fact; it is the state of mind with which an act is done; it is the motive from which an act springs; and in this case a fraudulent intent is the purpose of the defendant to do an act to defraud or cheat the bank, and to convert to his own use the sums of money set out in counts Nos. 2 and 39, in which he is charged with embezzlement with such fraudulent intent; and unless the jury believe that it has been established by the testimony beyond a reasonable doubt, as a fact existing at the time that the act was so done, it is the duty of the jury to acquit. The court has given this charge No. 11, asked for by the defendant, and now the court further charges you that the rule of law in regard to intent in this case is this: The intent to defraud is to be inferred from willfully and knowingly doing that which is wrongful or illegal, and which, in its necessary consequences and results, must injure another. The intent may be presumed from the doing of the wrongful or fraudulent or illegal act. But this inference or presumption is not necessarily conclusive. There may be other evidence which may satisfy the jury that there was no such intent, but such inference or presumption throws the burden of proof upon the defendant, and the evidence upon him in rebuttal to do away with that presumption of guilty intent must be sufficiently strong to satisfy you beyond a reasonable doubt that there was no such guilty intent in such transaction. The presumption is that a person intends the natural and probable consequence of acts intentionally done, and that an unlawful act implies an unlawful intent. The law presumes that every man intends the legitimate consequences of his own acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proved to have been knowingly committed. It is a well-settled rule, which the law applies in both criminal and civil cases, that the intent is presumed and inferred from the result·of the action. If, therefore, you believe from the evidence, to the exclusion of a reasonable doubt, that the defendant willfully and knowingly appropriated to his own uses either the $2,000 of the bank's money mentioned in one count of the indictment, or the $3,736.60 of the bank's money mentioned in the other count thereof, or both of those sums, then from those facts, if proved to your satisfaction, you should deduce the presumption that he intended thereby to injure or defraud the said bank in either or both instances which such character of appropriation was made, if at all, by the defendant. This presumption, however, as I have said, is not conclusive; still, when it is drawn by you from the evidence, it would be sufficient to support a conclusion that the intent of the defendant in willfully and knowingly appropriating those parts

of the bank's money to his own use, if that was done, was to injure or defraud the bank, unless this presumption is overcome or rebutted by evidence in behalf of the defendant, or other evidence in the case. Agnew v. U. S., 165 U. S. 49, 17 Sup. Ct. 235, 41 L. Ed. 624."

To the part of the charge as to the shifting of the burden of proof, counsel for the defendant took a specific exception. This portion of the charge is as follows:

"But this inference or presumption is not necessarily conclusive. There may be other evidence which may satisfy the jury that there was no such intent. But such inference or presumption throws the burden of proof upon the defendant, and the evidence upon him in rebuttal to do away with that presumption of guilty intent must be sufficiently strong to satisfy you beyond a reasonable doubt that there was no such guilty intent in the transaction."

When exception was taken to this language, the learned trial judge responded:

"That takes only a part of it, and it takes it out of its connection; but the court thinks the whole connection expresses the law accurately, because it is expressed in the exact language of the supreme court of the United States, but taking out some part of it may not make it entirely accurate. The court will not undertake to modify that particular part for the reason indicated."

It is elementary law that the burden of proof to establish the commission of a crime, and every essential element thereof, rests upon the prosecution. The statute under cover of which McKnight was prosecuted makes it essential, in order to work conviction, that the acts charged shall be done with intent to defraud the bank. In the absence of such intent, however culpable the acts charged may be, there can be no conviction for a violation of this part of the law. McKnight v. U. S., 49 C. C. A. 594, 111 Fed. 735. How is this intent to be proven? In view of the fact that intent or purpose is involved in a mental process which can only be known to the actor, the law requires only such proof as the nature of the thing to be proven admits; and it has long been the practice to instruct juries in such trials that the intent may be proven by the act done, and that one may be presumed to have intended the natural and probable consequences of acts intentionally done. This is a rule of logical probability from the usual course of events, rather than a conclusive legal presumption. The presumption is a rebuttable one, and, if other proof in the case shall repel the presumption which would ordinarily arise from the things done, the jury is under no necessity of resorting to presumptions, but should give weight to the facts which show the lack of intent or purpose in the particular case. This method of making proof of intent to defraud, as necessarily flowing from acts whose legitimate tendency is to defraud, does not absolve the prosecution from the requirement of showing intent, when that is an essential element of the crime, by the rule of evidence which requires proof in criminal cases to be sufficiently certain as to exclude reasonable doubt of guilt. If the burden of proof shifted to the defendant when the prosecution has introduced testimony from which the jury, in the absence of other proof, may infer the presence of guilty purpose or intent,—especially if the defendant was required to establish this want

of intent beyond a reasonable doubt,—the accused may be convicted when the proof leaves in the minds of the jurors a reasonable doubt of his guilt as to an essential element of the crime. In the present case, if the jury should find that the natural and probable consequence of the acts of McKnight charged and proven under the counts of the indictment was to defraud the bank, then the jury would be authorized to conclude that such was his purpose, in the absence of proof in the case rendering such inference inadmissible. While the jury may be properly instructed as to the manner in which intent—"dwelling in the mind, invisible to the outward sight"—may be proven from inferences from acts done, the burden of proving evil intent, where an essential element of the crime, is with the prosecution, and does not shift to the accused. Chaffee v. U. S., 18 Wall. 516, 21 L. Ed. 908; Jones, Ev. § 175; Whart. Cr. Ev. § 344; Com. v. McKie, 1 Gray, 61, 61 Am. Dec. 410.

The learned judge justified the charge given in this respect by the case of Agnew v. U. S., 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624. That case was a prosecution against a bank cashier for violation of the section of the statute under which McKnight is prosecuted in this case. The question here involved arose on exception to that part of the charge of the court which said:

"The rule of law in regard to intent is that intent to defraud is to be inferred from willfully and knowingly doing that which is illegal, and which, in its necessary consequences and results, must injure another. The intent may be presumed from the doing of the wrongful or fraudulent or illegal act, and in this case, if you find that the defendant placed that which was worthless or of little value among the assets of the bank at a greatly exaggerated value, and had that exaggerated value placed to his own personal account upon the books of the bank, from such finding of fact you must necessarily infer that the intent with which he did that act was to injure or defraud the bank, but this inference or presumption is not necessarily conclusive. There may be other evidence which may satisfy the jury that there was no such intent, but such an inference or presumption throws the burden of proof upon the defendant, and the evidence upon him in rebuttal to do away with that presumption of guilty intent must be sufficiently strong to satisfy you beyond a reasonable doubt that there was no such guilty intent in such transaction."

On this charge the chief justice said:

"Undoubtedly in criminal cases the burden of establishing guilt rests upon the prosecution from the beginning to the end of the trial. But when a prima facie case has been made out, as conviction follows unless it be rebutted, the necessity of adducing evidence then devolves on the accused. The circuit court, in this part of the charge, was dealing with the intent to defraud the bank, and rightly instructed the jury that, if they found certain facts, such intent was necessarily to be inferred therefrom. This was in application of the presumption that a person intends the natural and probable consequences of acts intentionally done, and that an unlawful act implies an unlawful intent. 1 Greenl. Ev. § 18; 3 Greenl. Ev. §§ 13, 14; Jones, Ev. § 23; Bish. Cr. Prac. §§ 1100, 1101, and cases cited. The circuit court, however, told the jury that the presumption of the intent to defraud and injure, if the facts were found as stated, was not conclusive, but, in substance, that its strength was such that it could only be overcome by evidence that created a reasonable doubt of its correctness; in other words, that, as the presumption put the intent beyond reasonable doubt, it must prevail, unless evidence of at least equivalent weight were adduced to the contrary. The question of the particular intent was not treated as a ques-

tion of law, but as a question to be submitted to the jury, and, conceding that the statement of the court that the evidence to overcome the presumption must be sufficiently strong to satisfy the jury 'beyond a reasonable doubt' was open to objection for want of accuracy, we are unable to perceive that this would have tended to prejudice the defendant, when the charge is considered as a whole."

The chief justice then goes forward to show that in the particular case the inaccurate instruction had worked no harm to the accused, and a reversal on that ground was refused. But clearly the chief justice did not mean to approve any such doctrine as requires the defendant to take upon himself the burden of establishing his innocence. This is shown by the emphatic declaration that in criminal cases the burden of establishing guilt rests upon the prosecution from the beginning to the end of the trial. In the case then before the court, as we read it, no other doctrine was intended to be established than the familiar one thus stated in the opinion. A reversal in that case was prevented because the inaccurate charge, in the opinion of the court, worked no harm, in view of the repeated and emphatic instructions that the crime, and every element of it, including the intent to defraud the bank, must be proven beyond a reasonable doubt. In the present case the language used was not, as the learned trial judge seemed to conclude, a statement of the doctrine of the supreme court, but was the language of the trial judge which is denominated as inaccurate by the chief justice. It is true that the charge below in the present case lays down the correct rule in other parts of the charge, but it is also true that the jury was told:

"The burden of proof in the case is upon the United States, and, subject to what will be hereafter said upon the question of proof of intent, continues throughout the case until the United States has shown by the evidence, to the exclusion of a reasonable doubt, that the defendant is guilty."

Later the court gave the charge as to proving the intent of the accused, which is excepted to. We cannot say that this was harmless error. The intent to defraud was a vital element of the case to be made out by the United States. If McKnight loaned the money to irresponsible persons for an illegal purpose, as the government's testimony tended to prove, the intent to defraud might well be inferred. If, on the other hand, as the defendant's testimony, if credited, tended to prove, the loan was made to persons believed to be good, for no illegal purpose, the intent to defraud would be negatived. In any aspect, the question was for the jury, under instructions which kept in view the settled rule of the criminal law which requires the allegations of the indictment as to the essential elements of the crime to be established by the government by proof beyond a reasonable doubt.

2. We might conclude this opinion with the disposition just made of the question raised, but, in view of a new trial of the case, we deem it proper to notice other assignments of error as to matters which have been fully argued, and concern questions likely to again arise.

In order to support the allegations of count 2, upon which there was a conviction, the government proposed to introduce in evidence a copy of a certain paper showing the agreement of McKnight, Britt,

and Reeder, and other aldermen of Louisville, to "caucus" together in order to control legislation and official appointments in said city. This was the agreement, as is claimed and charged in the indictment, which was the consideration for paying to Britt and Reeder the sum of $2,000 of the funds of the bank. This document was an important item of evidence for the government, and highly incriminating in character against the accused. After the introduction of evidence tending to show that the original was last seen in the possession of the defendant, the district attorney proceeded to offer a copy in evidence, when, as the record discloses, the following occurred:

"A. My recollection is that I was in his office, and he either had this paper on his desk or brought it in there,—I don't remember which,—and I made a copy of it in pencil. Q. What did he say when he brought it to you? A. I don't remember any conversation that took place between us at that time. Q. But he had a paper in his possession, which you copied in pencil, and then you made that copy from the pencil copy. A. Yes, sir. Q. Is that a copy or the original? A. This does not contain any name of McKnight, does it? Q. I think so. A. It seems to me that the 'McKnight' was put in here in pencil. Mr. Breckinridge: We want to save an exception to any statement of the contents of that paper. The Court: You can tell whether that is an accurate copy of the paper you saw in the defendant's possession at this time? A. I think it is. I believe it is. Q. Did you attempt to make an exact copy when you wrote these copies? (Question objected to by the defendant. Objection overruled, to which the defendant, by counsel, excepted.) A. I did. Q. You say you do not remember anything that was said to you by Mr. McKnight at the time he told you he had that paper? A. No, sir; I do not recollect anything,—any conversation at all that we had at that time. Q. Do you remember before that time of him having told you anything about it? A. Yes, sir; my recollection is he mentioned something about the matter. Q. What did he say about it? A. Simply that he had the paper. I don't think I had ever seen the paper up to that time that I saw it on his desk. Q. What did he tell you before you saw it on his desk,—about it? A. I do not remember of any conversation at all that passed between us. Q. Will you please read that paper? (Question objected to by the defendant.) By the Court: The paper from which this was taken was last found in the possession of the defendant. Now, if the district attorney chooses, he can demand the production of that paper. Mr. Hill: I do demand that paper. The Court: Is it produced, or is it desired to produce it, by the defendant? Col. Breckinridge: We deny the right of the district attorney to make the demand. By the Court: That, of course, is involved in your objection. The question is, do you produce it? Col. Breckinridge: We want to save exception to your honor's suggestion. The Court: You can reserve any exception you please. The court rules this can be received as secondary evidence only after a demand has been made for a production of the original. The district attorney has demanded, in the presence of the court, the original paper. Col. Breckinridge: The defendant first excepts to the demand being made now, as not being legal; second, there is no such paper in his possession. The Court: That is not the question. You do not produce the paper? Col. Breckinridge: In answer to the demand of the district attorney, counsel for the defendant announce that there was no such paper in existence. Therefore, it never was in his possession, and no such demand can be complied with. By the Court: The essential thing is, you decline to produce it. Col. Breckinridge: No, sir; 'declining' means we have the power to do so. The Court: Oh, no. Col. Breckinridge: I should think it does. The Court: You decline to produce it. The defendant failing to produce the paper upon the demand of the district attorney, this can be offered. Col. Breckinridge: We desire an exception to your honor's ruling that the district attorney has a right to demand a production of the paper from us. The Court: The court does not rule anything, except to inquire whether the district attor-

ney has made this demand. The court says it cannot allow the contents of that paper to be presented unless the proper foundation has been laid by a demand for the production of the original. The district attorney, as I understand it, has made this demand now for the production of the original paper, which was last heard of in the possession of the defendant. That demand not having been complied with, the court rules that this paper may be read. Col. Breckinridge: To that the defendant excepts. We desire to go further, and not merely to except, but to say in answer to that demand that there was no such paper ever in the possession of the defendant, and therefore he does not decline to deliver the paper, but answers 'that there is no such paper to deliver. The Court: That is a question of 'proof, entirely. Counsel cannot testify for the defendant. Col. Breckinridge: No one can make answer for the defendant but the defendant himself. The Court: He can testify in rebuttal to this proposition. Col. Breckinridge: He can do more than that, and we object to the statement as to his right to testify. The Court: I did not mean he could testify in person, but he can introduce testimony in rebuttal of the proposition. (And thereupon the jury were told by the court to disregard the statement first made.) Col. Breckinridge: A demand is made in the presence of the jury, and the defendant simply answers the demand which, under the permission of the court, and in the presence of the court and this jury, the district attorney has made. By the Court: The court makes no suggestions, except as stating the rule of law in regard to proof by secondary evidence of the contents of this paper on the part of the United States. The rule of law is perfectly familiar to counsel, as well as to the court, that secondary evidence cannot be produced unless the original is accounted for, and the foundation for the introduction of secondary evidence is laid, which is well understood to be a demand on the party in whose possession the paper was last seen to produce it. Then, if that paper is not produced, the question is concluded, or evidence can be heard on one side or the other as to whether the paper was ever in existence; and that is a matter for the jury to determine after hearing all the testimony. Col. Breckinridge: If your honor will allow me, one ground upon which we make objection is that there is already testimony that the government took possession of all the papers that were in that bank, including this dictation. Now, your honor has ruled, as a matter of law, that the defendant is obliged to produce that paper, when there is already testimony that all the papers were taken possession of by the government, so that your honor has ruled' that secondary evidence can be introduced simply upon a demand on the defendant for the production of the paper, without any evidence going to explain whether that paper was or was not in his possession. By the Court: Counsel, if he will recall, will understand that the court has made no such rule as he states. Furthermore, there is no proof that this paper was ever taken by any officer of the United States. Mr. Hill: Or that it was one of the bank's papers. The Court: That suggestion is very proper. So, to put an end to the matter, the court permits the witness to answer the question. Col. Breckinridge: We desire to object to the signatures because there is no proof that the signatures were made to that paper. The court allows the paper to be read? The Court: Yes. (Exception for the defendant.) Q. Read that. A. 'Louisville, Ky., Feb. 5, 1896. We do this day and date agree with one another, and bind ourselves on our sacred' words and honors, that we will stand together on any and all propositions of legislation that may come before the body of which we are members, namely, the board of aldermen of the city of Louisville; that we will so caucus with our friend,'—then with that blank filled in afterwards in pencil, with 'J. M. McKnight'— Q. Was that in the original? A. That is my recollection. I made a copy of it, and my recollection is, I left that out. Q. Read it right along. A. 'And act wisely, and secure for our friends an equal division of the offices and any profits that may arise therefrom; that we, as men and members of the upper board, will not allow the mayor to force upon us any appointment that we do not deem wise and to our interests, and, in so doing, will not act the first night on any proposition sent in by the mayor, but will take one week for consideration and caucus.

Now, we have calmly considered the above, and do again pledge ourselves, one to the other, before subscribing our names this day and date, February 5th, 1896, in the presence of one and the other.' By Mr. Hill: I ask that he be permitted to read the signatures. The Court: Does he know that those signatures were there? Q. Were those signatures on the original? A. Yes, sir. By Mr. Breckinridge: Does he know the signatures? The Court: He says they were there. A. I don't know the signatures of these gentlemen."

In what thus took place between the court and counsel, it is claimed that error was committed by the trial judge in two particulars: (1) In permitting the defendant to be called upon to produce the paper in open court, and while upon trial before the jury; (2) in the comments of the court upon the·right of the defendant to testify in his own behalf. Of the first alleged error, it is argued that to thus call upon the defendant for the production of this criminating document was to violate the immunity secured to him by the fifth amendment to the constitution of the United States, providing that no person in any criminal case shall be compelled to be a witness against himself. The construction of this amendment was before the supreme court of the United States in the leading case of Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, in which the opinion is by Mr. Justice Bradley, whose language has been very frequently cited with approval in later cases before the supreme court. In that case the court had under consideration a section of the customs revenue laws of the United States, authorizing a court of the United States, in revenue cases, on motion of the government's attorney, to require the production of books, invoices, and papers in court, or else the allegations of the attorney to be taken as confessed; and it was held that such act was unconstitutional and void, as applied to suits for penalties or forfeitures of the party's goods, as being repugnant to the fourth and fifth amendments to the constitution. In the course of his elaborate opinion in that case, which may be justly styled one of the great opinions of the distinguished justice who wrote it, reference is made to the fact that, in empowering the courts of the United States to compel parties to produce books and papers in their possession containing evidence pertinent to the issue, the right is limited to cases and under circumstances where they might be compelled to produce the same (books or writings) by the ordinary rules of proceedings in chancery; and Justice Bradley says:

"The restriction of this proceeding to cases and under circumstances where they [the parties] might be compelled to produce the same [books or writings] by the ordinary rules of procedure in chancery shows the wisdom of the congress of 1789. The court of chancery had for generations been weighing and balancing the rules to be observed in granting discovery on bills filed for that purpose, in the endeavor to fix upon such as would best secure the ends of justice. To go beyond the point to which that court had gone may well have been thought hazardous. Now, it is elementary knowledge that one cardinal rule of the court of chancery is never to decree a discovery which might tend to convict the party of a crime or to forfeit his property. And any compulsory discovery, by extorting the party's oath, or compelling the production of his private books or papers, to convict him of crime or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman. It is abhorrent to the instincts of an American. It may suit the purposes

of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom."

In that case it was held that the compulsory production of books and papers in a case which sought the forfeiture of estate was within the reasoning of criminal proceedings, and the case leaves no room for doubt that the compulsory production of a criminating document by the accused when on trial for crime is compelling him to testify against himself, within the meaning of the fifth amendment to the constitution. The chief justice and Justice Miller dissented from the opinion of the majority, holding that the compulsory production of documents did not come within the fourth amendment, as an unreasonable search or seizure, but concurred with the majority in holding the act to be in violation of the fifth amendment, and, in effect, equivalent to a subpœna duces tecum, disobedience to which, though not punishable by fine and imprisonment, "is one which may be made more severe, namely, to have charges of a criminal nature taken as confessed, and made the foundation of the judgment of the court." Nor is it essential to the ends of justice that the accused may be thus called upon to produce evidence of a documentary character. The authorities seem very clear that in such cases, where a criminating document directly bearing upon the issue to be proven is in the possession of the accused, the prosecution may be permitted to show the contents thereof, without notice to the defendant to produce it. As it would be beyond the power of the court to require the accused to criminate himself by the production of the paper as evidence against himself, secondary evidence is admissible to show its contents. As the introduction of secondary evidence of a writing in such instances is founded upon proof showing the original to be in the possession of the defendant, it will ordinarily be in his power to produce it, if he regards it for his interest to do so. The court, as we have seen, cannot compel a defendant in a criminal case to produce an incriminating writing. The notice would therefore be futile as a means of compelling the production of the document, and refusal to comply therewith might work injustice to the defendant in the inferences drawn from its nonproduction. The rule in this respect is thus stated in 3 Rice, Ev. p. 45:

"If the indictment alleges that the accused is the custodian of a document needed in evidence, or where the evidence in the case shows it to be in his possession, or that of an accomplice who refuses to produce it on the ground of its criminating tendency, the state is not obliged to give notice to produce it."

This statement seems amply sustained by well-considered cases. U. S. v. Reyburn, 6 Pet. 352, 8 L. Ed. 424; State v. Gurnee, 14 Kan. 111; U. S. v. Doebler, Baldw. 519, Fed. Cas. No. 14,977.

In the case just cited the question is elaborately discussed by Mr. Justice Baldwin, of the supreme court, sitting at the circuit. Among other things, that learned judge says:

"The secondary evidence was in all these cases admitted on the ground of the paper being in the possession of the defendant or third person, which accounted for their nonproduction, and showed that there has been no default in the prosecutor, where the paper had been secreted to protect the prisoner, or is in his own possession. In such cases the admission of the

secondary evidence depends on tracing the original paper to the hands of the defendant or third person, from whom it cannot be procured, and not on the question of notice. This is the rule laid down in Rex v. Layer, 6 How. St. Tr. 319, and adopted in Le Merchant's Case, 2 Term R. 203, note, in Snell's Case, 3 Mass. 82, and in U. S. v. Reyburn, 6 Pet. 366, 368, 8 L. Ed. 424. The evidence goes to the jury, who will decide whether the paper has been so traced. It is a legal foundation for a verdict against the defendant, as if the original had been produced, and it is not restricted to papers which are the immediate subject of the indictment. Rex v. Gordon, 1 Leach, 300, note."

See, also, 3 Russ. Crimes, 373; McGinnis v. State, 24 Ind. 500.

A perusal of the decisions of the supreme court shows that no constitutional right has been the subject of more jealous care than that which protects one accused of crime from being compelled to give testimony against himself. The right to such protection existed at the common law, and was carried into the constitution, that the citizen might be forever protected from inquisitorial proceedings compelling him to bear testimony against himself of acts which might subject him to punishment. In the present case the accused, in the presence of the jury, was, by direction of the court, called upon to produce the document which it was alleged contained the corrupt agreement which was the basis of the note given by irresponsible persons for the funds of the bank by McKnight's direction. The production of such a paper would have been self-criminating to the defendant in the highest degree. It is true, the learned judge made no order requiring its production; but the accused, by the demand made upon him before the jury, after proof tending to show his possession of the document, was required either to produce it, deny or explain his want of possession of the writing, or by his very silence permit inferences to be drawn against him quite as prejudicial as positive testimony would be. Nor were the jury advised that the nonproduction of the writing afforded no ground for an inference of guilt. We think this procedure was an infraction of the constitutional rights of the accused, within the meaning of the fifth amendment to the constitution. Recurring to the opinion of Mr. Justice Bradley in the Boyd Case, supra, we may quote:

"It may be, it is the obnoxious thing in its least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be legally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the court to be watchful of the constitutional right of the citizen, and against any stealthy encroachments thereon. Their motto should be, 'Obsta principiis.' "

In the course of the colloquy as to the admission of secondary evidence as to the writing in question, the comment was made concerning the right of the accused to testify which is here complained of. The court having observed that counsel could not testify for the defendant, his counsel responded:

"No one can make answer for the defendant but the defendant himself. The Court: He can testify in rebuttal to this proposition. Col. Breckinridge: He can do more than that, and we object to the statement as to his right

to testify. The Court: I did not mean that he could testify in person, but he can introduce testimony in rebuttal of the proposition. (And thereupon the jury were told by the court to disregard the statement first made.)"

The act of congress of March 16, 1878, provides:

"That in the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of crimes, offences, and misdemeanors, in the United States courts, territorial courts and courts-martial, and courts of inquiry, in any state or territory, the person so charged shall, at his own request, but not otherwise, be a competent witness. And his failure to make such a request shall not create any presumption against him."

The act was under consideration in the case of Wilson v. U. S., 149 U. S. 60, 13 Sup. Ct. 765, 37 L. Ed. 650. In that case the comprehensive opinion of Mr. Justice Field leaves little to be added in a discussion of the provisions and scope of this act. The act was passed in order to give the defendant the privilege denied him at the common law of testifying in his own behalf. It recognized that, while such a statute might be available in the vindication of the innocent, it does not permit enforced testimony from one on trial for an offense. It is distinctly provided that a failure to testify should not create any presumption against the defendant. In the case of Wilson v. U. S., supra, Mr. Justice Field said:

"To prevent such presumption being created, comment—especially hostile comment—upon such failure must necessarily be excluded from the jury. The minds of the jurors can only remain unaffected from this circumstance by excluding all reference to it."

In many of the states it is especially provided that no mention shall be made of the failure of the accused to testify. This provision is not in the federal statutes, but, as the supreme court has construed it, it is only available to the defendant if all reference thereto is withheld. The reference to the right of the defendant to testify where he does not see fit to avail himself of the privilege puts him in a position where the jury will draw inferences against him from his silence, and the statute which was intended as a shield for protection will be turned into a weapon of attack in establishing his guilt. There are two lines of decisions in the state courts arising upon facts disclosing a reference to this right of the defendant to testify by the court or prosecuting attorney. One line of cases holds that, when any reference has been made in the presence of the jury to the fact that the accused may testify, the error is irretrievable, and no subsequent instruction can dispel the effect of the allusion. In the very instruction not to draw inferences from the silence of the accused, the fact is brought to the minds of the jury that he may, if he will, testify in his own behalf. Another line of cases holds that when the jury are told, in clear and emphatic terms, that no inference can be drawn against the accused because of his failure to testify in his own behalf, this dispels the effect of the allusion, and the error is cured. In the Wilson Case, supra, while the question was not directly before the court as to whether such an instruction would cure the error, Mr. Justice Field said:

"It [the court] should have said that counsel is forbidden by the statute to make any comment which would create or tend to create a presumption against the defendant from his failure to testify."

If this will prevent a reversal, where unfortunately reference is made to the right of the defendant to testify in his own behalf, we do not think the record discloses in this case such correction of the impression as must have been left upon the jury by the statement of the judge that the defendant might testify in rebuttal. The jury was not told specifically what the statement first made was, and, if the jury understood the court to refer to the right of the defendant to testify, they were not told, as Mr. Justice Field says is the duty of the court under such circumstances, in clear and emphatic terms, that no importance whatever could be attached to the failure of the defendant to testify. Nor does it make any difference that the defendant afterward testified. As has been said in some authorities, after allusion has once been made to the right of the defendant to testify, the accused is virtually driven upon the stand, or remains off at the peril of having inferences drawn against him from his silence, when the law gives him the right to speak.

We are of the opinion that what was said by the trial judge in response to the objection of counsel as to the right of the defendant to testify was not cured by any subsequent statement to the jury upon that subject.

3. When this case was first before this court (McKnight v. U. S., 38 C. C. A. 115, 97 Fed. 208), it was held that the count charging the Britt and Reeder note transaction was valid as against the objection then urged that it did not charge that the $2,000 was converted to the use of McKnight. We then held that the indictment sufficiently averred the conversion, in the allegation of the wrongful payment of the money to Britt and Reeder for the unlawful purpose charged against the defendant. In charging the jury, the court told them, in language of which there can be no just complaint, that the elements of the offense of embezzlement were defined in the statute under consideration to be as follows:

"First, the person accused must have been an officer of a national bank at the time the offense, if any, was committed by him; second, he must, as such officer, have been intrusted by said bank with the care and custody of its money; third, he must have fraudulently appropriated to his own use some of the money so intrusted to him; fourth, such fraudulent appropriation thereof must have been with the intent to injure or defraud the bank."

Subsequently the court charged:

"I have already endeavored clearly and explicitly to state to you the four essential elements necessary to constitute the offense charged in this count of the indictment, and I repeat to you that each of those elements must be established to your satisfaction by the evidence to the exclusion of a reasonable doubt; but I equally as explicitly charge you that if you believe from the evidence, to the exclusion of a reasonable doubt, that each such element of the offense charged is so proved in its substance and general scope, it is sufficient to warrant a conviction of the defendant, whether all of the particulars set forth in the indictment are specifically and exactly proved or not; and therefore if you believe from the evidence, to the exclusion of a reasonable doubt, that the defendant fraudulently converted the $2,000 mentioned in this count to his own use, with the intent to injure or defraud the German National Bank, —he being then its president, and intrusted with the custody of its money, if such are the facts,—then you should find the defendant guilty under this count, whether Reeder or Britt, or either of them, was insolvent or not, or whether any person or persons

other than said Britt and Reeder signed so-called caucus agreement or not, or whether any of the persons named in this count of the indictment ever in fact thereafter caucused with the defendant."

The theory of this count of the indictment is that McKnight, having the custody and control of the funds of the bank, as president, paid or directed to be paid $2,000 thereof to Britt and Reeder for the purpose of bribing them to "caucus" with him, and "stand together" to secure division of the offices and profits ensuing therefrom, with the intent to defraud the bank, by this means, of the funds so intrusted to him. That this transaction may also have taken the character of a loan does not deprive it of the essential elements of criminality, if proved as charged. U. S. v. Fish (C. C.) 24 Fed. 585. This fraudulent scheme involved the turning over of $2,000 of trust funds upon the written obligation of insolvent persons, as charged in the indictment. The court charged that McKnight might be convicted if the jury believed that he fraudulently converted the $2,000 to his own uses with intent to defraud the bank; he being then its president, and intrusted with the custody of its money. And in that connection the court told the jury that it would make no difference whether Britt and Reeder were insolvent or not. But if the money was given to Britt and Reeder upon their paper, which they could be made to pay, it was, it seems to us, a very weighty circumstance in determining whether McKnight intended to defraud the bank or not. Indeed, if Britt and Reeder were responsible financially, it is difficult to perceive how the bank could be defrauded. It is to be remembered that McKnight is here charged with an offense under the banking laws of the United States, not with the bribery of aldermen. This may be, and, no doubt, is, a separate offense against the laws of Kentucky. It is important in this case only as a part of the scheme by which he is charged to have embezzled the funds of the bank. Britt and Reeder could certainly not defend against the note in the hands of the bank because McKnight had intended to bribe them. In determining his guilt, therefore, under the charge made, it was important to know what McKnight's understanding was as to the solvency of the makers of the note. While technically true that McKnight might be convicted if he intended to defraud the bank by paying out trust funds to Britt and Reeder, yet in determining that issue the jury should not have been allowed to ignore the solvency or insolvency of the makers of the note, because no fraud upon the bank could result if it received a good note, although its proceeds were put to bad uses. It is quite true, as the learned judge charged, that, if the money was paid to Britt and Reeder with the intent and in the manner charged, it is wholly immaterial whether the caucus agreement was fully signed, or ever, in fact, carried out.

4. It is further alleged that it is necessary to prove that McKnight did the things charged in the indictment without the consent of the board of directors or the discount committee. The embezzlement feature of the act was before the supreme court of the United States in Claassen v. U. S., 142 U. S. 140, 12 Sup. Ct. 169, 35 L. Ed. 966. In this case it was held sufficient to charge that the defendant was the president of a national bank association, and that by virtue of

his office he received into his possession the funds of the bank, and fraudulently converted them to his own use. Mr. Justice Gray, delivering the opinion of the court, said:

"There can be no doubt of the sufficiency of the first count on which the defendant was convicted. It avers that the defendant was president of a national bank association; that by virtue of his office he received and took into his possession certain bonds, fully described, the property of the association; and that, with intent to injure and defraud the association, he embezzled the bonds and converted them to his own use. On principle and precedent, no further averment was requisite to a complete and sufficient description of the crime charged. U. S. v. Britton, 107 U. S. 655–659, 2 Sup. Ct. 512, 27 L. Ed. 520; Rex v. Johnson, 3 Maule & S. 539–549; Starkie, Cr. Pl. (2d Ed.) 454; 3 Chit. Cr. Law, 981; 2 Bish. Cr. Proc. §§ 315–322."

In the case of U. S. v. Britton, 108 U. S. 193, 2 Sup. Ct. 529, 27 L. Ed. 701, the court had under consideration an indictment attempting to charge willful misapplication of certain funds of the bank, with intent to defraud the association, and held insufficient a count which charged the president of the bank with procuring the discount by the bank of a note not well secured, and of which both the maker and the indorser were insolvent, to the knowledge of the president, who applied the proceeds to his own use. Mr. Justice Woods, delivering the opinion of the court in this case, said:

"One branch of the business of a banking association is the discounting and negotiating of promissory notes; and this to be done by its board of directors, or duly authorized officers or agents. Rev. St. § 5136. There is no provision of the statute which forbids the discounting of a note not well secured, or both the maker and indorser of which are insolvent. It is within the discretion of the directors, or the officers or agents lawfully appointed by them, to discount such a note, if they see fit; and it might, under certain circumstances, tend to the advantage of the association. This count does not charge that the note of the defendant was discounted at his instance, without the authority of the board of directors. On the contrary, the charge is that he caused and procured it to be discounted. This implies that it was done by the directors or other duly authorized officers or agents. It is not alleged that the discount was procured by any fraudulent means. From all that appears, the board of directors, or the officer or agent by whom the note was discounted, may, upon knowledge of all the facts, in the utmost good faith, and for the advantage of the association, have decided to discount the note. The discount may have turned out to be a benefit to the association, for there is no averment that the note was not paid at maturity, or that the association suffered any loss by reason of its discount. But whether the discount of the note was an advantage to the association or not, and whether the note was paid or not, is immaterial. If an officer of a banking association, being insolvent, submits his own note, with an insolvent indorser as security, to the board of directors for discount, and they, knowing the facts, order it to be discounted, it would approach the verge of absurdity to say that the use by the officer of the proceeds of the discount for his own purposes would be a willful misapplication of the funds of the bank, and subject him to a criminal prosecution. The count under consideration charges nothing more than this against the defendant. We are of the opinion, therefore, that it does not charge an offense under Rev. St. § 5209."

In a later case (Evans v. U. S., 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830), in which Evans was indicted for aiding and abetting a cashier in misappropriating the funds of a bank, the sufficiency of the indictment was under consideration. Mr. Justice Brown, delivering

the opinion of the court, distinguished this case from the case of U. S. v. Britton, and said:

"It is objected, however, to this count, that there was no averment that the cashier, in discounting the note, acted in excess of his powers, or outside of his regular duties; nor was there any averment that the cashier was not the duly authorized officer of the bank to discount paper; nor was there any averment that the discount was procured by fraudulent means, or that Evans was at the time of such discount insolvent, or knew himself to be so. It was held by this court in Bank v. Dunn, 6 Pet. 51, 8 L. Ed. 316, that the power to discount paper was not one of the implied powers of the cashier, and this is believed to be the law at the present day. Morse, Banking, § 117. If the directors had authorized their cashier, either generally or in this particular case, to discount the paper, it was clearly matter of defense. But even if he did possess such power, and willfully abused it by discounting notes which he knew to be worthless, and did this with the deliberate intent to defraud the bank, it is not perceived that his criminality is any less than it would have been if he had acted beyond the scope of his authority."

In the present case, while it is averred that the transactions of McKnight were without the consent of the board of directors or of the discount committee, when the proof tended to establish that McKnight loaned the funds of the bank to irresponsible persons under the facts set forth, this certainly would raise no presumption that the board of directors had authorized the transactions; and if the defendant relied upon such authority, as Justice Brown says:

"If the directors of the bank had authorized their cashier, either generally or in this particular case, to discount paper, it was clearly matter of defense."

In criminal cases, as we have seen, the burden of proof rests upon the government to make out the guilt of the defendant beyond the existence of a reasonable doubt; but when it is shown that the illegal transaction had the character of that charged in the indictment, and the authority of the board of directors is relied on to sanction it, it would be matter of defense. In the Britton Case Mr. Justice Woods said that under the allegations of that indictment the defendant might be convicted, although the board of directors had discounted the note knowing the facts. Undoubtedly, in making out the offense of embezzlement, it is essential to show the fraudulent conversion of the funds of the bank; and if the directors, knowing all the facts, and acting in good faith, approve of the discount or other appropriation of the bank's money, the crime would be deprived of one of its essential elements. In the Britton Case, supra, the court was dealing with the misapplication feature of the statute, and, for aught that appears in the record, the misapplication charged might have consisted of the discount of a note concerning which the board of directors were fully advised, and had authorized such action. But where the proof shows transactions so extraordinary as those charged in this indictment, and which the testimony tended to establish, we think the issue may be submitted to the jury without affirmative proof as to the want of consent of the directors. And when such consent is relied upon as a defense, we think it essential to prove that the directors acted with knowledge and in good faith. Certainly if the directors conspired with the president to defraud the bank, and there-

fore gave consent to the appropriation of the bank's funds, it would be no defense to a prosecution under this act. U. S. v. Eno (C. C.) 56 Fed. 218. In the case of U. S. v. Taintor, Fed. Cas. No. 16,428, 11 Blatchf. 374, where the defendant had been charged with embezzling, abstracting, and willfully misapplying the funds of a national bank, it was offered to show that the purposes for which the funds were taken were known to the president and some of the directors of the bank, and were sanctioned by them, and the dealings were for the interest and benefit of the bank, and believed by the defendant to be sanctioned by the president and some of the directors, although without any resolution of that body. This proof was offered for the purpose of showing that the dealings were carried on without any intention of injuring or defrauding the association. After consideration, upon motion for new trial, the circuit court, consisting of Woodruff, circuit judge, and Blatchford and Benedict, district judges, held the testimony incompetent, and overruled the motion. In the present case we have not discovered any testimony in the record tending to show the consent of the board of directors to the transaction. It is true that one member of the discount committee is alleged to have been consulted, but it does not appear that he was fully advised as to the facts. We are not willing to sanction a doctrine which prevents conviction for embezzlement, because the funds were converted with the consent of the board of directors, unless it appears to have been given in good faith and with knowledge of the facts. Where such circumstances are disclosed as indicate that such may have been the action of the board, as in Britton's Case, supra, it will be incumbent upon the government to negative the consent of the directors of the bank. But where the allegations and proof raise no such presumption of authority, if the accused relies upon such consent as removing one essential element of embezzlement or misapplication, it is a matter of defense, to be proven by him. Evans v. U. S., 153 U. S. 593, 14 Sup. Ct. 934, 38 L. Ed. 830.

For the reasons hereinbefore stated, the decision of the district court will be reversed, and the case remanded for a new trial.