SPRAGUE *v.* STATE OF INDIANA.
[No. 24,813. Filed June 24, 1932.]

584

*Walter Olds, Howard L. Townsend* and *Albert E. Thomas,* for appellant.

*Arthur L. Gilliom,* Attorney-General, and *Edward J. Lennon, Jr.,* Deputy Attorney-General, for the State.

MYERS, J.—Appellant, in the court below, was indicted, tried and convicted of grand larceny. §2451 Burns 1926. On appeal to this court he has assigned as errors the overruling of his motion to "quash the first paragraph of the indictment"; the overruling of his motion to be discharged under the statutory third term rule; and the overruling of his motion for a new trial.

The motion to quash is predicated on the theory of two indictments, and the failure of the grand jury foreman to indorse on each "A True Bill" and sign the same. The indictment in form for grand larceny and for embezzlement was complete as separate indictments, each closed by the signature of the prosecuting attorney. The two sheets of paper embodying the two charges were fastened together, and on the back, immediately following the title of the case and the words "Indictment for Grand Larceny and Embezzlement," was the following indorsement: "A True Bill, Richard J. Blackwell, Foreman." The trial court evidently treated the document thus prepared as a single indictment consisting of two counts. The two sheets so attached were correctly interpreted as one instrument, and the indorsement by the foreman of the grand jury as stated was sufficient in that respect to repel a motion to quash. *Blume* v. *State* (1900), 154 Ind. 343, 56 N. E. 771; *State* v. *Bowman* (1885), 103 Ind. 69, 2 N. E. 289.

The question on the motion to discharge the defendant for the reason he was not brought to trial within the period of three terms of court "not including the term at which a recognizance was first taken" depends alone upon whether or not the applicant was instrumental in any way in causing the delay. §2252

Burns 1926. The applicant made a sufficient showing of time to try him at the third term, but there was a counter-showing to the effect that the time for his trial was extended by consent of the State upon the request and for various reasons offered by counsel for appellant, otherwise he would have been tried not later than the third term after his recognizance was entered. The showing of the applicant and the counter-showing on the part of the State were sufficient to raise an issue of fact for the trial court to decide. That question, under the evidence submitted to the court, was sufficient to justify a finding either for or against the applicant. Under such a state of the record this court would not be justified in disturbing the finding of the trial court on that issue. *Gale* v. *State* (1929), 201 Ind. 532, 168 N. E. 241; *Rosenberg* v. *State* (1922), 192 Ind. 485, 134 N. E. 856, 137 N. E. 53; *Hinshaw* v. *State* (1897), 147 Ind. 334, 47 N. E. 157; *Keyes* v. *State* (1890), 122 Ind. 527, 23 N. E. 1097.

Appellant, in his motion for a new trial, aside from verdict not sustained by sufficient evidence and verdict contrary to law, assigned 83 alleged erroneous causes, but in his brief, under the head of "Points, Propositions and Authorities," he calls our attention to 58 rulings of the court alleged to be erroneous which involved the admission or refusal to admit evidence, but is content to cite authorities claimed to sustain three only. Under the head of "Argument," in support of his contention that the verdict of the jury is contrary to law, he refers to 37 *rulings on the evidence.*

Upon a careful reading of appellant's brief, we have reached the conclusion that it would serve no good purpose to take the space necessary to rule upon each item of evidence claimed to be erroneously admitted or refused, for the reason that these various rulings of the trial court in reality involve only four questions: (1)

Refusing to strike out certain testimony; (2) refusing to permit the defendant to prove the prevailing custom of brokers in handling transactions similar to the one between the defendant and the prosecuting witness; (3) admitting evidence of transactions by defendant with other persons said to be similar to the one had with the prosecuting witness prior to, about the time of, and eight months after the alleged larceny; and (4) admission in evidence of the notice by the State to the defendant to produce his books, records, etc., showing the transactions between appellant and his customers.

At the close of the State's evidence the second count of the indictment charging embezzlement was dismissed. The count charging grand larceny, at present material, stated that F. Guy Sprague "did then and there feloniously, unlawfully and purposely steal, take and carry away of the personal goods and chattels of Jesse W. Bowers, one certificate calling for two hundred (200) shares of the common capital stock of the Sinclair Consolidated Oil Corporation then and there of the value of eight thousand ($8,000.00) dollars."

Appellant first moved to strike out the testimony of the prosecuting witness covering four pages of the record, which he insists was a conversation with one Ford, who the evidence shows was the manager of appellant's business, but by reference to the record it appears that most of this conversation, if not all, was had with the defendant or with Ford in the presence of the defendant. The second motion to strike related to Sprague assuring the prosecuting witness that the shares of stock, if left with him, would be kept in a safety deposit box at the Lincoln Trust Company. This motion is supported by the claim that this testimony did not tend to prove or disprove the charge of embezzlement. The third motion was on the ground that the answer of the witness Buist, "Yes, I made an examina-

tion of the books of Mr. Sprague in the early part of 1922," was hearsay and a conclusion, and not responsive to the question: "State whether or not you made an examination of any books for him (Mr. Cutshall) back in 1921 or 1922?" It was shown that Mr. Cutshall was the trustee in the Sprague bankruptcy proceedings, and as such trustee had possession of Sprague's books and caused them to be audited by the witness Buist. Thereafter, and prior to the instant trial, the books were returned to Sprague. There was no error in any of these rulings.

The fourth motion was to strike out the evidence of four witnesses for the reason that their testimony was an attempt to show other transactions by the defendant similar to the one charged in the instant case, on the ground that they were not similar, wholly different, in that the instant alleged larceny was predicated upon a special and separate agreement fraudulently made with the prosecuting witness for the purpose of inducing him to part with the possession of his oil stock. Furthermore, that it tended to prove independent offenses. What we shall say on this motion applies to the questions raised on the admission of evidence included in our classification (3) above.

It is obvious that the evidence of transactions with persons other than Bowers, both before and after the one mentioned in the indictment, was admitted, not for the purpose of showing the commission of distinct crimes, but as tending to show a general system inaugurated by appellant to defraud, or as bearing on the question of criminal intent in his dealings with Bowers. *Zimmerman* v. *State* (1921), 190 Ind. 537, 130 N. E. 235. The testimony of these witnesses stopped short only of an agreement by appellant to retain the custody of their collaterals at the Lincoln Trust Company or at any other place, but it did tend to

show, as in the instant case, the purpose for which they were obtained—collateral on indebtedness for purchases made—and their use by appellant to secure payment of his indebtedness to Wagner and Company, brokers. There was evidence before the jury to the effect that appellant used his customers' collateral with their consent, but whether this was true or not was a question for the jury. To this particular phase of this case we apply the principle that, one receiving from another negotiable securities or stocks as collateral security, or as a guaranty of the performance of a principal agreement, would not be authorized, without the consent of the pledgor, to separate it from the primary contract and to use it as security for the payment of his own obligations. To do so would be a misappropriation of the pledged property.

In *Warfield* v. *Adams* (1913), 215 Mass. 506, 515, 102 N. E. 706, it is said: "A pledgee has no right to separate collateral from the debt for which it is pledged and to re-hypothecate it for a new loan made to him by a third person. A pledgee (in the absence of a special agreement) is bound to hold the collateral pledged to him as security for the debt for which it was pledged so that the pledgor can redeem his property at any time by paying the debt for which it is security."

Our second combination of questions is fairly exemplified by a refused offer to prove the custom of doing business in the office of Sprague known to Bowers, and the custom of brokers generally to have pledged certificates indorsed. The evidence without dispute conclusively shows that the subject of the larceny—oil stock—was delivered by Bowers to appellant as collateral security for a debt incurred by him in the purchase of additional stock. The stock so pledged was admittedly indorsed by the pledgor. The legal effect of the indorsement is not questioned, nor is it

claimed that the pledgor was thereby misled. The agreement, if proved, between appellant and Bowers was not ambiguous. It fixed the place for safe-keeping of the stock. In effect it forbad the re-hypothecation of the collateral by appellant. Under the circumstances here stated generally, Bowers' indorsement of the stock and its deposit with appellant as collateral security created the relation of pledgor and pledgee, notwithstanding the asserted common-law custom among brokers. It is only when the legal effect of an agreement, or when the language of the contract is so drawn that it is ambiguous, that it will be construed in the light of the circumstances surrounding the parties when the agreement was made. *Wilson* v. *Randall* (1876), 67 N. Y. 338, 341; *Walker* v. *Tucker* (1873), 70 Ill. 527, 532; *Lowber* v. *Bangs* (1864), 69 U. S. (2 Wall.) 728, 737, 17 L. Ed. 768.

There is a marked distinction between the use of the principal contract, payment of which is secured by collateral, and a secondary contract detached and used as collateral by the pledgee for a loan from or the payment of a debt to a third party. The mere indorsement of the stock by Bowers put the appellant in a position to dispose of it, but under the circumstances of this case, as between himself and Bowers, he had no lawful authority so to do, nor was the custom sought to be proved of such universality and antiquity that would give it the force and effect of law paramount to the settled law applicable to collateral security contracts. There was no error in excluding this evidence.

Appellant also objected to the testimony of the accountant Buist by which he gave in detail the contents of the books, records, etc., of appellant showing the business conducted by him as a broker at his office in Fort Wayne, Indiana. This testimony exhibited the liabilities and assets of all kinds on hand at the time he filed his petition in bankruptcy; also that

the stock of Bowers placed with him as collateral security had been hypothecated with E. W. Wagner and Company. There was no error in admitting this evidence, inasmuch as the State had laid the foundation for its admission by notice to appellant to produce his books to be used at the trial. This notice was marked as State's Exhibit B, and over appellant's objection it was admitted in evidence. The notice, in substance, called upon the defendant to produce in court certain of his books and papers which gave a complete account of appellant's business, his purchases and sales, the persons with whom he did business, the kind and character of his assets, and his liabilities and to whom and on what account; and further notifying him that in case he failed to produce his books, etc., oral evidence of their contents would be offered by the State at the trial. He refused to comply with the notice, as he had a right to do. In *McGinnis* v. *State* (1865), 24 Ind. 500, 503, it was held to be "well settled in criminal cases, that the court cannot compel the defendant to produce an instrument in writing, in his possession, to be used in evidence against him, as to do so would be to compel the defendant to furnish evidence against himself, which the law prohibits." The court further said: "It is, therefore, difficult to perceive what benefit could result, either to the state or the defendant, from the giving of such a notice, while to the defendant it is liable to work a positive injury, by producing an unfavorable impression against him, in the minds of the jury, upon his refusal to produce it after notice."

The objection urged against admitting Exhibit B in evidence was, in substance, that it was not a proper record to go to the jury, as it would be prejudicial to his defense and in violation of his constitutional rights. No notice was given for the production of the certificates of stock, which was the subject

of the larceny, and none was required (*McGinnis* v. *State*, *supra*), but it did include the records, books, etc., of appellant, which, according to the oral evidence of their contents, contained a memorandum of the trans-actions between appellant and Bowers, and some 2,500 other persons. At the time the notice was introduced in evidence, the embezzlement charge, as well as the larceny charge, was pending before the jury, but in either case the question of its admission would be the same.

The objections to the admission of the notice in evidence, reasonably construed, amounted to a claim of constitutional privilege. The notice alone as to any issue in the case had no probative value. Consequently we are only concerned with its effect as a challenge to the defendant requiring him to speak if he would avoid inferences which might be reasonably drawn from refusal to comply with it, thereby indirectly, if not directly, compelling him to "testify against himself," thereby infringing his constitutional privilege. Art. 1, §14, Constitution of Indiana. We can readily understand why the notice and the refusal of the defendant to comply therewith would be proper preliminary matters for the trial court for the purpose of laying the foundation for the admission of secondary evidence, but we are not advised of any reason, and we know of none, justifying its admission as evidence generally in the case. It was permitted to go to the jury without limitation or explanation and the jury was not admonished that it was a matter alone for the court. If it was proper to go to the jury generally, it was in evidence for all purposes, and that it was so considered is manifest from the ruling of the court permitting counsel for the State, over the objection of appellant, over his request that the court admonish the jury that such remarks were improper, and denying his request that the submission be set aside and the jury discharged, to

make the following comment: "You will remember the state produced a notice for the defendant, Sprague, to produce his books," etc.; "The legality or illegality of these transactions as to who 711, 811, 911, and BH Special were, were matters that could have been demonstrated and explained to this jury by the production in this court of the books; I wonder if these books were shown the jury would have a better understanding," etc.; "They could have procured Wagner, or some of their firm, to come here with their books," etc. "Sprague could have gotten Wagner here with his books just as easily as he got Mr. Wiscosku, the telegraph operator." There were other expressions by counsel for the State of the same general character.

The foregoing statements are in the record, properly authenticated by a bill of exceptions, and are assigned as causes for a new trial. We may very properly consider them in connection with the objections urged to the admission of Exhibit B. Furthermore, in this connection, we may well look to the instructions given by the court to the jury. At the request of the State the court gave instructions Nos. 19, 20 and 23, by which they were three times told, in substance, that if they found from the evidence that appellant had it in his power to produce a witness or witnesses whose testimony would or could explain the transaction between the defendant and the prosecuting witness, or what the defendant did with the stock described in the indictment, or what became of the proceeds thereof, and in case they found that the defendant turned over to the trustee in bankruptcy all of the stock in his possession and did not at that time have in his possession the stock described in the indictment, and that he omitted or failed to produce such witness, his failure so to do would raise the presumption that the *evidence* or testimony, if produced,

would be unfavorable or prejudicial to him. The Attorney-General, with all the evidence before him, justifies the giving of these instructions because they apply to the failure of appellant to produce his books. He says: "The very fact that appellant has in his possession records that might exonerate him or prove that the whereabouts of the stock was questionable and such books were purposely withheld by appellant, this fact would create the adverse presumption and the jury should be instructed that it was a matter for their consideration."

As we have seen, there was oral evidence tending to show that the books of appellant then in his possession exhibited the fact of the purchase of 200 additional shares of stock from appellant, and as security for the unpaid purchase price thereof, 200 shares of stock fully paid for were deposited with appellant as collateral security; that the stock so deposited was not in the possession of appellant at the time he filed his petition in bankruptcy nor thereafter. It therefore appears that had appellant complied with the notice and brought his books into court for use as evidence, the account involved in this prosecution would have been exhibited to the jury, as also others somewhat similar.

The consensus of judicial opinion is that a defendant in a criminal prosecution cannot be compelled to give or furnish evidence which will incriminate him, nor can the State, without his consent to be a witness, call him as a witness for any character of questioning. *Overman* v. *State* (1924), 194 Ind. 483, 143 N. E. 604; *State* v. *Pence* (1909), 173 Ind. 99, 89 N. E. 488, 25 L. R. A. (N. S.) 818, 140 Am. St. 240, 20 Ann. Cas. 1180; *Cooper* v. *State* (1888), 86 Ala. 610, 6 So. 110, 4 L. R. A. 766, 11 Am. St. 84.

It is not claimed, nor will it be insisted, that the notice of itself tended to prove any issue, nor that the

State might have called the defendant to the witness stand and by questions compelled him to refuse to produce his books at the trial to be used in evidence. We see no practical difference between that method and the one here pursued. The court and not the jury determines the admissibility of evidence, and the foundation for the admission of secondary evidence is a matter alone for the court and not for the jury. The State having adopted the precautionary method of giving appellant notice to produce his books at the trial, it should have been submitted to the court without the presence of the jury. *Boyle* v. *Smithman* (1892), 146 Pa. 255, 274, 23 Atl. 397; *Commonwealth* v. *Valeroso* (1922), 273 Pa. 213, 222, 116 Atl. 828; *Gillespie* v. *State* (1911), 5 Okla. Crim. 546, 115 Pac. 620, 35 L. R. A. (N. S.) 1171, Ann. Cas. 1912D 259; *People* v. *Gibson* (1916), 218 N. Y. 70, 112 N. E. 730, Ann. Cas. 1918B 509; *Lamson* v. *Boyden* (1896), 160 Ill. 613, 43 N. E. 781; *State* v. *Merkley* (1888), 74 Iowa 695, 698, 39 N. W. 111; *Bain* v. *United States* (1920), 262 Fed. 664.

We cannot say what effect Exhibit B and appellant's non-compliance therewith might have had on the jury. It could have reasonably inferred that the books specified in the notice would furnish evidence favorable to the State. Counsel for the State drew that inference in their argument to the jury. We can very readily understand the force and effect on the jury of such unqualified and apparently court-approved argument. It was predicated upon improperly admitted evidence which must be regarded as harmful.

While the three instructions of the court to which we have called attention used the words "witness or witnesses—evidence or testimony," yet the evidence to which they possibly might apply is so uncertain and indefinite that the jury could have reasonably inferred that the non-production of the books by appellant would

have the same force and effect, inasmuch as that phase of the evidence was so strongly emphasized.

Upon the whole case here presented we have concluded that the court erred in permitting the State to introduce in evidence its Exhibit B, and in permitting counsel for the State to make the assertions above shown, for which errors the judgment in this case should be reversed.

Judgment reversed, with instructions to grant appellant's motion for a new trial, and for further proceedings not inconsistent with this opinion.

Martin, J., and Treanor, J., dissent.