# Richmond

GORDON H. POWELL *v.* COMMONWEALTH OF VIRGINIA.

January 14, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Carter & Williams* and *Margaret L. Carter*, for the plaintiff in error.

*Abram P. Staples, Attorney-General*, and *Joseph L. Kelly, Jr., Special Assistant*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

At the March term, 1936, of the Corporation Court of the City of Danville, Gordon H. Powell was indicted for forgery. He was charged with forging what purported to be a note of W. F. Knight for $1,000 of date December 5, 1935, and was charged also with uttering the same, knowing it to be forged. This note was discounted by the Industrial Bank of Danville. At the same term a number of other indictments were returned against Powell, charging him with forging other notes, both before and after the Knight note was forged, among which was one of T. J. Wood for $1,500, one of E. W. Arnett for $750, and one of L. J. Feldman for $630. The Powell case was continued from time to time and was finally set down for trial on the 21st of July, 1936. On the 18th day of July, 1936, the attorney for the Commonwealth executed a certain paper addressed to Powell and to his counsel, which set out the Wood, the Arnett and Feldman indictments, charged that these three notes were in the possession of Powell or counsel and said that they would be required to produce them at the trial. This paper was duly served the 20th day of July, 1936.

The case came on for trial on July 21, 1936; Powell was arraigned and pleaded not guilty. It was heard in due course and on the 4th day of August, 1936, a jury returned this verdict. "We, the jury, find the defendant guilty as charged in the indictment and fix the punishment at eight years in pen-

itentiary." There was a motion to set it aside, which was overruled. Sentence was then pronounced.

During the opening statement of the attorney for the Commonwealth he said that evidence would be produced to show that about the time Powell uttered the Knight note, he negotiated and uttered other forged notes, among them the Wood, Arnett and Feldman notes, and that this evidence would be introduced for the purpose of showing guilty knowledge.

Powell's counsel in his opening statement said that some of the notes mentioned were not forged, that others came into Powell's possession honestly and were negotiated in good faith, and that as to others, he could not say with exactness how he came by them. Counsel also stated that it was his intention to call Powell as a witness, when the opportunity presented itself.

For the Commonwealth, George S. Hughes, the assistant cashier of the Industrial Bank of Danville, was called. He identified the Powell note which was introduced in evidence. He also identified and introduced in evidence eight other original notes charged to have been forged, brought to his bank by Powell and discounted. He was then handed what purported to be typewritten copies of the Wood, Arnett and Feldman notes. These copies he said were true copies, the originals of which had been discounted by his bank for Powell. No objection was offered to the introduction in evidence of these typewritten copies. Then followed this incident:

"Whereupon, the witness testified that the three type-written copies handed him by the Attorney for the Commonwealth were true copies of notes purporting to be signed by T. J. Wood, E. W. Arnett, and L. J. Feldman, respectively, which original notes had been brought to his bank by the defendant, Gordon H. Powell, on or about the date appearing on the respective typewritten copies, and that said Gordon H. Powell negotiated said original notes and that the net proceeds of said notes were remitted to the Powell-Thompson Corporation.

"The witness further testified that on the originals the defendant, Gordon H. Powell, wrote in the presence of the witness the names 'Powell-Thompson Corporation' and 'Gordon H. Powell' in the same places that these names appeared on the copies. The defendant offered no objection to the introduction of the typewritten copies or to the evidence of the witness with respect thereto.

"Whereupon, the Court inquired of the Attorney for the Commonwealth as to why he was introducing the typewritten copies into the evidence rather than the original notes. Whereupon, the Attorney for the Commonwealth in the presence of the jury stated that the original of each of the notes represented by the said typewritten copies had been delivered by the bank to the defendant and that he, the Attorney for the Commonwealth, had had a *subpoena duces tecum* served upon the defendant and his counsel requiring that said original notes be produced by the defendant or his counsel at this trial, and the Attorney for the Commonwealth turned to counsel for the defendant and asked him to produce the original notes mentioned in the *subpoena duces tecum* which has been hereinbefore set out in this bill of exceptions.

"The defendant by counsel objected to the action and statement of the Attorney for the Commonwealth in the presence of the jury as being improper and prejudicial conduct of the prosecuting officer and moved the Court to discharge a juror and order a mistrial for the reason that the action and statement of the Attorney for the Commonwealth in the presence of the jury taken in connection with the *subpoena duces tecum* served on the defendant and his counsel had been in effect a request and demand by the Attorney for the Commonwealth that the defendant should produce the originals of the Wood, Arnett and Feldman notes (typewritten copies of which had already been introduced in evidence) and therefore and thereby constituted a demand and request by the Attorney for the Commonwealth that the defendant should give evidence against himself in violation of his constitutional right to remain silent and in violation of his constitutional right not to produce said original notes,

all of which had been thus sharply brought to the attention of the Jury and had thereby placed the defendant in a position where he could not freely and voluntarily exercise his right and privilege to remain silent and his right and privilege not to produce the original notes requested and demanded of him because under such circumstances, his failure or refusal to testify and to produce said original notes would obviously prejudice his cause with the Jury trying his case.

"Whereupon, the Court without advising or informing the Jury as to the defendant's constitutional right to remain silent and to refuse to produce the papers called for and without informing or advising the Jury that they should not consider the statement of the Attorney for the Commonwealth made in their presence, which has been heretofore set out, overruled the objection of the defendant and overruled the defendant's motion to discharge a juror and order a mistrial, to which action of the Court, the defendant by counsel excepted."

The witness Hughes said that these three notes had been delivered by the bank to Powell on February 29, 1936, after Powell had paid them. They were then handed to Hughes by the defendant's counsel and identified. Their makers were examined and declared them to be forgery.

Powell took the stand and said that he had taken them to the bank and had there negotiated them; that the net proceeds of each were remitted by the bank to the Powell-Thompson Corporation, and that he had personally written the name of the corporation and his own name on them wherever they appeared. He said that he had not forged these signatures and had no knowledge of the forgeries when they were negotiated.

It is not contended that the evidence is insufficient to support the judgment but it is contended that the constitutional right of the prisoner had not been waived and has been violated, and upon that issue this case turns.

The Constitution U. S. Amend. 5 declares that no person "shall be compelled in any criminal case to be a witness against himself." The Constitution of Virginia, section 8,

contains a like provision: "He shall not be deprived of life or liberty, except by the law of the land or the judgment of his peers; nor be compelled in any criminal proceeding to give evidence against himself." While by Code, section 4778, the accused is given the right to testify in his own behalf, this is a privilege extended to him but not a burden imposed. The liberty of choice is with him; he may sit silent without comment and from his conduct no inference is to be drawn. *Blair* v. *Commonwealth* (June 11, 1936), 166 Va. 715, 185 S. E. 900, 901.

An interesting discussion of the nature of this immunity, its origin and extent, will be found in *Counselman* v. *Hitchcock*, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110. In Virginia it was last under review in the *Blair Case*. There the defendant was charged with an attempt to rape. After the evidence was all in, after the jury had been instructed and after the argument had been completed, one of the jurymen asked the court "if the jury could have the benefit of the defendant's testimony." He was then offered as a witness by his counsel, examined and re-examined. This, we held, violated his constitutional rights. The attorney general contended that they were waived when he took the stand. Had he voluntarily done so that would have been true. The immunity given does not avail when the accused offers himself voluntarily as a witness (Code, section 4778), nor can it avail if immunity co-extensive with the constitutional privilege of silence is guaranteed to him by statute. *Flanary's Case*, 113 Va. 775, 75 S. E. 289.

And in the *Flanary Case* it was said that these constitutional provisions should be liberally construed else the intent thereof would be unavailing. Moreover, "the waiver of such a privilege as we are now considering must always be made understandingly and willingly, and generally after being fully warned by the court." *Cullen* v. *Commonwealth*, 24 Gratt. (65 Va.) 624; I Greenleaf, Ev. section 451.

Pertinent in principle also is *Wilson* v. *Com.*, 157 Va. 962, 162 S. E. 15, 16. Mrs. Wilson, the wife of the accused, was called as a witness for the prosecution. On motion the court

ruled that she was an incompetent witness, under the provisions of Code, section 6211. It is there said "but neither (husband nor wife) shall be compelled, nor without the consent of the other, allowed to be called as a witness against the other except" etc.

Chief Justice Campbell, in commenting upon the conduct of the Commonwealth's attorney, said:

"The evil which the legislature sought to correct is exemplified in the case at bar, viz: The intentional effort of the attorney for the Commonwealth to force the accused to object to the introduction of his wife as a witness against him, and thus, perhaps, have the jury place upon him the odium of seeking to prevent a fair investigation of the transaction. An accused should not, by wilful act, be placed in such an attitude before the jury by the representative of the Commonwealth whose duty to prosecute one accused of crime is co-existent with his duty to see that the accused is accorded a fair and impartial trial."

For the Commonwealth it is contended that all of this is in conflict with *Chahoon* v. *Commonwealth*, 20 Gratt. (61 Va.) 733. We think it is not, but if it were we would still follow later cases cited, *supra*, which approve and reapprove the contentions here made by the accused.

The defendant there asked for this instruction:

"To convict the accused the jury must be governed entirely by the testimony before them and the fair inferences therefrom; and that they must not presume or assume the guilt of the accused by reason of his failure or neglect to produce evidence in his own behalf."

The court said it was good law but might mislead the jury and that to it there should have been some such addition as this:

"But, if the jury believe that it is in the power of the accused to produce evidence in elucidation of the subject matter of the charge against him, then his failure or neglect to produce such evidence may be considered by the jury in connection with the other facts proved in the case."

We find no conflict here; no constitutional question was

involved. The jury might fairly have considered the failure of the accused to produce evidence but it can scarcely be contended that the judge meant to say that Chahoon's failure to testify was in itself a fact to be considered.

Always there rests upon the accused the burden of explaining away incriminating evidence, where a *prima facie* case is made out, and, if he fails, such failure may be commented upon in argument but not his failure to testify.

These cases make plain the policy of Virginia.

Whenever the accused, because of some incident in the trial and through no fault of his, is forced to testify for fear that adverse inferences might be drawn from his failure, then he has not volunteered as a witness and has not waived his rights. Such waiver only follows where liberty of choice has been fully accorded. *Miller* v. *Commonwealth*, 153 Va. 890, 149 S. E. 459, 68 A. L. R. 1102; *Price* v. *Commonwealth*, 77 Va. 393.

It may be well to make final disposition of two matters which naturally suggest themselves. Typewritten copies of these notes, which were secondary evidence, had already been introduced by the Commonwealth and to their introduction there was no objection. It therefore was not necessary for the attorney for the Commonwealth to do anything by way of compliance with the best evidence rule.

In *McKnight* v. *United States*, (C. C. A. 6, May 6, 1902), 54 C. C. A. 358, 115 F. 972, 980, the court said:

"Nor is it essential to the ends of justice that the accused may be thus called upon to produce evidence of a documentary character. The authorities seem very clear that in such cases, where a criminating document directly bearing upon the issue to be proven is in the possession of the accused, the prosecution may be permitted to show the contents thereof, without notice to the defendant to produce it. As it would be beyond the power of the court to require the accused to criminate himself by the production of the paper as evidence against himself, secondary evidence is admissible to show its contents. As the introduction of secondary evidence of a writing in such instances is founded upon proof showing the

original to be in the possession of the defendant, it will ordinarily be in his power to produce it, if he regards it for his interest to do so. The court, as we have seen, cannot compel a defendant in a criminal case to produce an incriminating writing. The notice would therefore be futile as a means of compelling the production of the document, and refusal to comply therewith might work injustice to the defendant in the inferences drawn from its nonproduction."

Nor are we concerned with the curative effect of an admonition given by the court to the jury after the attorney for the Commonwealth had made such demand of the accused, for in this case the demand was made at the instance of the court itself after the Commonwealth had concluded the presentation of its case in chief. Moreover the court did not indicate to the accused that his constitutional rights were in any wise involved.

When the law elsewhere than in Virginia is examined, we find the leading case to be *McKnight* v. *United States, supra.* There Judges Lurton, Day and Severens, Circuit Judges of the Sixth Circuit, presided. Two of those gentlemen were afterwards distinguished justices of the Supreme Court. The opinion is by Judge Day and bears date May 6, 1902. McKnight was three times convicted. His appeals will be found in (C. C. A.) 97 F. 208, 209, (C. C. A.) 115 F. 972, and (C. C. A.) 122 F. 926.

It is his second appeal with which we are most concerned. He was president of the German National Bank of Louisville, Kentucky, and was on trial for the embezzlement of its funds. One of the counts of the indictment charged in substance that $2,000 of the bank's funds were paid to certain individuals under the pretense of a loan, but were in fact paid to them as a bribe for the purpose of corruptly influencing their conduct as members of the board of aldermen of that city. During the examination of a witness for the government it developed that this witness claimed to be in possession of a copy of an agreement between the defendant and these aldermen, which agreement was in fact the real consideration for which the bank's money was paid. Evidence

was introduced tending to show that the original agreement when last seen was in the possession of the defendant. A copy of it was offered in evidence. After some discussion, the court suggested that the district attorney might, in the circumstances disclosed, demand the production of the original, whereupon he made such a demand, all done in the presence of the jury.

These contentions were then made:

"In what thus took place between the court and counsel, it is claimed that error was committed by the trial judge in two particulars: (1) In permitting the defendant to be called upon to produce the paper in open court, and while upon trial before the jury: (2) in the comments of the court upon the right of the defendant to testify in his own behalf. Of the first alleged error, it is argued that to thus call upon the defendant for the production of this criminating document was to violate the immunity secured to him by the fifth amendment to the Constitution of the United States, providing that no person in any criminal case shall be compelled to be a witness against himself."

In the course of his opinion, Judge Day said:

"A perusal of the decisions of the supreme court shows that no constitutional right has been the subject of more jealous care than that which protects one accused of crime from being compelled to give testimony against himself. The right to such protection existed at common law, and was carried into the Constitution, that the citizen might be forever protected from inquisitorial proceedings compelling him to bear testimony against himself of acts which might subject him to punishment. In the present case the accused, in the presence of the jury, was, by the direction of the court, called upon to produce the document which it was alleged contained the corrupt agreement which was the basis of the note given by irresponsible persons for the funds of the bank by McKnight's direction. The production of such a paper would have been self-criminating to the defendant in the highest degree. It is true, the learned judge made no order requiring its production; but the accused by the

demand made upon him before the jury, after proof tending to show his possession of the document, was required either to produce it, deny or explain his want of possession of the writing, or by his very silence permit inferences to be drawn against him quite as prejudicial as positive testimony would be. Nor were the jury advised that the nonproduction of the writing afforded no ground for an inference of guilt. We think this procedure was an infraction of the constitutional rights of the accused, within the meaning of the fifth amendment to the constitution."

He concludes these observations with this statement, taken from *Boyd* v. *U. S.*, 116 U. S. 616, 6 S. Ct. 524, 535, 29 L. Ed. 746:

"It may be, it is the obnoxious thing in its least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consists more in sound than in substance. It is the duty of the courts to be watchful of the constitutional right of the citizen, and against any stealthy encroachments thereon. Their motto should be *'Obsta principiis.'* "

This very excellent statement of the underlying and controlling reasons for this rule appears in *Gillespie* v. *State* (May 16, 1911), 5 Okl. Cr. 546, 115 P. 620, 621,35 L. R. A. (N. S.) 1171, Ann. Cas. 1912D, 259, where it is said:

"If a county attorney can, in the presence of the jury, demand of the defendant or his counsel the production of any letters or papers which may be proven to be in the possession of the defendant, of what value is this constitutional provision? It is true that making a demand upon a defendant to produce such letters or papers is a different thing from forcing him to produce them; but the effect is the same, because if a defendant refuses to comply with such a demand it is equivalent to admitting that the evidence demanded

would incriminate him, if it were produced. The observation and experience of all practising attorneys will sustain the statement that such an inference is more damaging to a defendant than a proven fact would be. When such a demand is made, a defendant must accept the alternative of either producing the letters, and thereby incriminating himself, or of having the jury place the strongest possible construction against him upon his failure to do so. If this can be done, the very life, body and soul of the constitution would be violated and trampled upon."

The principles applied in the McKnight case have been again and again approved. *Hibbard* v. *United States*, (C. C. A. 7th Circuit) 172 F. 66, 18 Ann. Cas. 1040; *Green* v. *United States*, (C. C. A. 8th Circuit) 266 F. 779; *Rocchia* v. *United States*, (C. C. A. 9th Circuit) 78 F. (2d) 966; *State* v. *Merkley*, 74 Iowa 695, 39 N. W. 111; *Gillespie* v. *State*, 5 Okl. Cr. 546, 115 P. 620, 35 L. R. A. (N. S.) 1171, Ann. Cas. 1912D, 259; *Commonwealth* v. *Valeroso*, 273 Pa. 213, 116 A. 828; *State* v. *Hollingsworth*, 191 N. C. 595, 132 S. E. 667; *Sprague* v. *State* (1932) 203 Ind. 581, 181 N. E. 507; *State* v. *Sonnenschein*, 37 S. D. 585, 159 N. W. 101; *People* v. *Chapman*, 55 Cal. App. 192, 203 P. 126, 130; *State* v. *Chamberlain*, 152 Minn. 401, 188 N. W. 1012; *State* v. *Jackson*, 83 Wash. 514, 145 P. 470; and *People* v. *Minkowitz*, 220 N. Y. 399, 115 N. E. 987.

The Commonwealth contends that they are unsound and to support that contention it relies upon the following authorites: *Bain* v. *United States*, (C. C. A.) 262 F. 664, 666; *Hanish* v. *United States*, (C. C. A.) 227 F. 584, 585; *Gridley* v. *United States*, (C. C. A.) 44 F. (2d) 716, 736; *People* v. *Chapman, supra*, and *People* v. *Gibson*, 218 N. Y. 70, 112 N. E. 730, 731, Ann. Cas. 1918B, 509, and particularly upon Wigmore on Evidence (1904 Ed.) page 3140, section 2273, note 3.

*Bain's Case* was decided by the same court that decided the *McKnight Case*. He was a business man who for many years had dealings with a neighboring national bank. Its cashier had paid over large sums to Bain by honoring his

checks and drafts not covered by deposits and had issued to him certificates of deposit without consideration. The cashier and Bain were indicted for conducting these transactions with intent to defraud. Some of the papers evidencing their dealings were in Bain's possession, and demand was made that he produce them. The court said:

"It is sufficient to say that the manner of the demand and the proceedings had in connection therewith clearly constitute error, in that they amounted to an attempt to compel the respondent to testify against himself, within the definition fixed by this court in *McKnight* v. *U. S.*, 115 F. 972, 54 C.C.A. 358."

And further, "Every such case must depend upon its own circumstances as to whether the net result is reversible error; * * *." Ample secondary evidence was at hand and not questioned. "* * * Bain produced all that he had of these same checks and drafts, and offered them in evidence; and while, under many circumstances, such a production and offering could not be called voluntary, after what had occurred, yet we have no substantial doubt that he would have produced and offered them just the same, if the objectionable demand had never been made. Further, it cannot be said that the evidence covered by the demand was 'highly incriminatory.'"

Since secondary evidence was at hand and not objected to, the court held that the evidence demanded was not highly incriminatory and that the error committed was not reversible.

Whether Bain would have produced these originals without compulsion is a matter of guess-work but their production was not particularly important. No question of forgery was involved.

In the case in judgment the existence of these writings charged to be forged was not questioned, but the defendant did contend that they were not forgeries. Admitted and unquestioned typewritten copies were conclusive as to their existence but could shed no light upon the question of forgery. That might or might not be made manifest by an examina-

tion of the original documents themselves and for that reason
· such evidence was highly important.

In *Hanish's Case* the prosecuting attorney sought to place
in evidence certain letters addressed to the defendant, con-
taining orders for alleged obscene matter and served notice
upon him to that effect. The court said:

"The notice to produce was entirely unnecessary, because
defendant could not be compelled to produce any document
constituting a link in the chain of evidence against him. By
correct criminal procedure the notice should never have been
given. Such a notice has no place therein. Much less should
it have been read in the jury's presence. *McKnight* v. *United
States*, 122 F. 926, 61 C. C. A. 112."

It went on, however, to say:. "But whether what was
done was prejudicial is a wholly different question. The
notice was not the sole evidence that the copies of the letters
put in evidence were true copies, that fact being established
by independent testimony. Without any notice to produce,
the letters were accordingly admissible. Had the letters
been incriminating on their face, as in the *McKnight Case*
(on another appeal, 115 F. 972, 54 C. C. A. 358, where the
document was 'highly incriminating'), the situation might
be different. Defendant was not ordered to produce the
original letters by the trial judge, nor even requested to do
so. Under such circumstances he was in no manner prejudiced
by the reading of the notice. His constitutional rights should
be carefully guarded by the court, but not to the limit of
pure sentimentalism."

Here also there was no question of forgery. Nothing
could have been proven by originals which could not have
been established by copies available and admitted to be copies,
and for this reason the originals of these decoy letters, sent by
a government inspector, were not necessary in order to make
out a case.

In *Gridley's Case*, it appears that Gridley was an attorney
and was prosecuting the celebrated Anneke Jans claim against
·Trinity Church, New York, and had sent letters to possible
claimants soliciting contributions from them after it had

become clear that no recovery was possible. There was an indictment for using the mails to defraud. The witness had testified to the mailing of a letter to the defendant containing three bank drafts payable to him. Those drafts were paid, introduced in evidence and identified. Objection was made to this evidence on the ground that it was secondary and that the envelopes and letters themselves were the best evidence. Demand was made upon the defendant for their production. Just what appeared in the letters we do not know. The court said, when objection was made to this demand as being high handed:

"The decision of this court in the case of *McKnight* v. *United States*, 115 F. 972, is cited in support of this position. The case is not in point. The contents of the document whose production was demanded there were material and incriminating. Here such was not the case. *Wilson* v. *United States* (C. C. A.) 275 F. 307, 313. Had the contents of the letter been material, they could have been proven without notice to produce as was decided in the *McKnight Case*. The notice to produce was brought about by appellants' frivolous objection and was not prejudicial. *Hanish* v. *United States* (C. C. A.) 227 F. 584, 585."

In *People* v. *Chapman*, the defendant was indicted for obtaining money by false pretense. A witness testified that two written contracts were mailed to the defendant in California. The court said: "So far as we are aware, neither writing may have contained anything that, by any possibility, could have proven harmful to defendant or to his cause." Demand was made upon the defendant that he produce them. The court in this manner disposed of that assignment:

"* * * even conceding that, for that reason, it was error to seek to prove defendant's possession of the writings by asking his counsel to produce them, still there is no showing of prejudice. For, aside from the court's stern rebuke of the district attorney and its vigorous admonition to the jury to disregard the improper demand, there is nothing to show that the writings, if produced, would have worked any damage to defendant. Appellant therefore has failed to make any

affirmative showing of reversible error. The rule obtaining in some jurisdictions that prejudice is presumed from any error of law has been abrogated in this state."

In *People* v. *Gibson*, it appears that Gibson was charged with embezzlement in his capacity as executor. Controversy arose over the admission of a paper signed by the administrator c. t. a. who succeeded him, demanding monies and property belonging to the estate of their decedent. When the accused was being cross-examined, the district attorney called upon him to produce this paper. It will be observed that here again no question of forgery was in issue. In a headnote to that case supported by the text it is said: "There was no error in permitting counsel to demand of the defendant accused of larceny that he produce papers alleged to be incriminating where the judge instructed the jury to disregard it and the discussion of its propriety."

The views of Professor Wigmore on this subject are stressed as controlling. These are:

"The following case is unique: 1902, *McKnight* v. *U. S.*, 54 C. C. A. 358, 115 F. 972, (after evidence that an incriminating document is in the accused's possession, no notice of production can be given by the prosecution, because the claiming of the privilege would permit inferences to be drawn against him; the ruling is made on the assumption that a copy could be used under such circumstances without notice to produce—an incorrect assumption, as shown *ante*, sections 1202, 1205, 1207. It also involves the fallacy that the mere necessity of making a claim of privilege for documents is improper because of the possible resulting inferences— a fallacy which reasons in a circle, because the privilege cannot be enforced until it is claimed, and the court cannot both enforce it and forbid the necessary condition precedent to enforcing it. The ruling also involves the fallacy that the accused's failure, on notice, to produce the document was equivalent to a claim of privilege, but it was not because it might have been done in precisely the same way for a noncriminating document, and would merely have served as a basis for the use of a copy by the prosecution. These three fallacies so subtly combine

in this ruling that the result is a plausible one; but the ruling remains purely fallacious and wholly unsound).''

. We need not concern ourselves with the first and third objections suggested. No error is assigned because of anything done dealing with the introduction of copies. As we have seen, notice was given, copies were introduced, and it was not until the Commonwealth had concluded in chief that a demand was made for the production of the originals, which demand was made at the suggestion of the court itself. Nor is it claimed here that the failure of the accused in the first place to produce the notes was equivalent to a claim of privilege. That claim was asserted not by inference but by positive protest.

Let us look for a moment at Professor Wigmore's second objection. "It also involves the fallacy that the mere necessity of making a claim of privilege for documents is improper because of the possible resulting inference—a fallacy which reasons in a circle, because the privilege cannot be enforced until it is claimed, and the court cannot both enforce it and forbid the necessary condition precedent to enforcing it."

Starkly stated, this issue may arise in this wise: A Commonwealth's attorney may demand from the accused the production of a note charged to be forged and charged to be in his possession. The court, before it passed upon this demand, might inquire into its relevancy and might be told that the signature to the note desired bore upon its face inherent evidence of fraud. The accused would then be required to take the stand, after which he could do one of two things. He could produce the note or he could say that I will not produce it because it will tend to show that I am guilty. All this in the presence of the jury. The claim of immunity would be a confession of guilt. For him to protest production would have been to admit that the documents desired were 'highly incriminatory,' and so we stumble into another circle with only a broken word of promise.

Some changes in Professor Wigmore's criticism of *McKnight's Case* appear from an examination of the second edition of his work on Evidence, volume 4, page 883. That

opinion he still characterizes as "The extraordinary ruling in *McKnight* v. *United States,* in 1902, which seems since to have exercised a baleful spell over a few other Courts."

We are not particularly concerned with the fact that a *subpoena duces tecum* issued. What does concern us is the demand made in open court and in the presence of the jury.

In *Commonwealth* v. *Hubbard* (1916) 65 Pa. Super. Ct. 213, cited and approved by the Supreme Court of Pennsylvania in *Commonwealth* v. *Valeroso, supra,* it was said that where demand is made for a paper, "the accused must then either produce the document, explain its nonproduction, or remain silent. In either circumstance, the result is likely to be highly prejudicial to his case before the jury."

And in *People* v. *Gibson, supra,* the Court of Appeals of New York expressly refused to follow Professor Wigmore and re-affirmed *McKnight's Case,* saying:

"To allow a demand for the production of a document to be made upon an accused person in the presence of the jury is to require him to produce it or deny his possession thereof, or by reason of his silence to warrant injurious inferences against him. For this reason the practice is properly forbidden."

To demand from the accused a document from which his guilt may be inferred is scarcely less harmful than to place him upon the stand and to ask him if he is guilty.

The Commonwealth contends that this error, conceding it to be error for argument's sake, is harmless. It is error and is presumed to be harmful. Plainly we cannot undertake to say that it is not.

We are further told that such rights as the prisoner had have been waived.

It is true that his counsel in an opening statement indicated his purpose to call the accused as a witness. Had this been done, he might have been questioned as to the whereabouts of these notes, and since he had them, he might have been told to produce them. But the time to do this was after he had been called. Counsel might have changed his mind and not called him at all. The privilege is highly

personal. If the witness wishes to answer, no one can object, and by the same token no one can waive for him this right. Underhill on Criminal Evidence (2d Ed.) page 449.

For reasons stated the judgment of the trial court should be reversed, and it is so ordered. This case is remanded to it for retrial in the light of the views here expressed.

*Reversed and remanded.*