[Crim. No. 2730. First Dist., Div. One. June 16, 1952.]

THE PEOPLE, Respondent, v. THOMAS P. TALLE,
Appellant.

James F. Boccardo, George T. Davis and Edwin H. Williams for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn and Winslow Christian, Deputy Attorneys General, N. J. Menard, District Attorney, and Louis P. Bergna, Deputy District Attorney, for Respondent.

PETERS, P. J.—Thomas P. Talle, by indictment, was charged with having murdered his wife, Margaret (Marge) Talle, on December 23, 1949. He pleaded not guilty. In due course he was tried before a jury and found guilty of murder of the first degree with a recommendation of life imprisonment. His motion for a new trial was denied, and judgment was entered. He appeals from the judgment and from the order denying his motion for a new trial.

Because of the comparatively long period (approximately 2½ years) that has expired since the commission of the offense and the determination of this appeal, some explanation of the delay is required. The trial started in April of 1950. Judgment was rendered June 26, 1950. The reporter's transcript (of 3,440 pages) was filed December 20, 1950. Appellant's opening brief was filed April 12, 1951. The respondent's brief was filed November 30, 1951. The appellant's closing brief was filed January 11, 1952. The cause was argued before this court on January 30, 1952. At that time appellant was granted 10 days to file a supplemental brief, and the respondent 10 days to reply. The appellant filed his supplemental brief on February 8, 1952. Respondent did not file its supplemental brief until April 14, 1952. The appeal was submitted that same day.

We have come to the conclusion that the judgment and order appealed from must be reversed. This conclusion is predicated upon the fact that the record demonstrates, for reasons hereafter set forth, that the defendant did not receive a fair trial.

Appellant urges that the evidence is insufficient to sustain the verdict of first degree murder. This contention is without merit. The evidence, although circumstantial and conflicting, is sufficient to sustain the implied finding of the jury that appellant murdered his wife, and that such act was premeditated and intentional.

The following recital of the basic facts is by no means

complete, but it is illustrative of the general tenor of the testimony.

In 1935 appellant married a Mary Van Dyke, and in 1936 a daughter was born of this union. In the spring of 1944 appellant, then still married to Mary, met Marge, the deceased, who was then employed in a hotel in Denver as cashier, and the two fell in love. Marge, at that time, was married. Appellant told Mary of his love for Marge, and the two were divorced. Marge secured a divorce from her husband. During the interlocutory period provided by Colorado law, Marge and appellant lived together. After the two divorces became final, and on November 19, 1945, Marge and appellant were married.

There is but little doubt that the married life of the couple was far from happy, largely caused by appellant's excessive drinking. In March, 1947, in Colorado, Marge filed an action for divorce against appellant, but shortly thereafter the two became reconciled, and in the fall of 1947 moved to California where they settled near Los Gatos.

There is evidence that while the Talles lived in Colorado, and also after they moved to California, appellant, on several occasions, threatened the life of Marge. This testimony was given by a Mrs. Shoemaker who testified that she heard appellant make such threats from early 1947 up to October of 1948. Most of these conversations occurred in the Tick Tock Lounge in Denver, apparently operated by Mr. Shoemaker, and where Mrs. Shoemaker also worked in the evenings. Appellant visited this bar frequently from the fall of 1946 until he moved to California late in 1947. Mrs. Shoemaker met Talle at this bar and sometimes drank with him. She testified that about February of 1947 she heard appellant talk about ''disposing'' of' Marge; that at that time appellant offered her and her husband $500 if they would give him the name of some person ''that could do the job''; that appellant was drinking at the time, but was not incoherent and appeared to know what he was talking about. Incidentally, Mr. Shoemaker was not called as a witness nor was his deposition taken, he apparently being sick at the time of trial.

Mrs. Shoemaker also testified that in March or April, 1947, while she and her husband were present, Talle stated that he could use his automobile to do the ''job'' and make it look like an accident. At about the same time he also stated, on several occasions, that he could put diamonds on Marge and make it look like robbery. She also testified that in August

of 1947, after the Talles had returned to Denver after a short visit to California, appellant told her that while in California he had "hired the best lawyer in the United States . . . Mr. Boccardo"; that when the witness asked why he had done this, he replied: "You don't think I am spending all this money because I want to live in California. I will move her out there where she won't have any friends and won't make any friends, and when the job is done, no one will be any the wiser."

This same witness testified that in March of 1947 (at a time the divorce proceeding was pending between appellant and Marge) she was present in a room at the Brown Palace Hotel in Denver with her husband, Talle, and Mary, Talle's divorced wife, and heard Talle try to induce Mary to come back to him; that Mary replied that he was still married to Marge, and would talk with him about that subject when the divorce had been secured; that appellant then stated: "I know how to get rid of Marge without spending any more money."

Another conversation relating to the "job" was had with appellant in August of 1948, when Talle returned to Denver on a visit. The witness testified that Talle then told her that Marge was pregnant (she was not); that all the plans had been made in respect to the "job," and that the witness "would never hear from Marge and never see her again alive"; that the witness then offered to bet appellant $50 that she would see Marge again, and her husband offered to put up the $50, but Talle did not put up any money, although the witness and Talle shook hands on the bet. Mrs. Shoemaker also testified that she did not repeat these conversations to anyone. She also testified as to certain acts of physical injury inflicted on Marge by appellant, in 1947 and 1948, as related to her by both Marge and appellant.

This was very damaging testimony indeed. Appellant, who testified on his own behalf, while admitting that he knew the Shoemakers, and drinking at the Tick Tock Lounge, specifically denied each of the conversations testified to by Mrs. Shoemaker. Of even greater importance, in each instance in which Mrs. Shoemaker had testified that a third person, other than her husband, was present at one of these conversations, that person was called as a witness and unequivocally denied hearing or participating in such a conversation. Thus, Mrs. Shoemaker had testified that one George Adams was present and heard the conversation in the Tick Tock Lounge about

putting diamonds on Marge to make the "job" look like a robbery, or using the car to make it look like an accident. Adams testified that in 1947 he knew the Shoemakers well, knew Talle casually, frequently visited the Tick Tock Lounge, and occasionally conversed with the Shoemakers and Talle. He testified that he had never heard Tom Talle make any remarks concerning his wife, or any statement about disposing of or killing his wife, and that, in fact, he did not even know then that Talle had a wife. The testimony of Mrs. Shoemaker was then read to him in which she had stated that, while Adams was present, Talle had made the above referred to statements, and he then testified that "There is absolutely no truth in it," and again, that if Mrs. Shoemaker so testified, such testimony was "definitely a lie."

Mrs. Shoemaker had also testified that a Jo Watkins (now Mrs. William Hott) had been present and participated in one of the conversations in which Talle is supposed to have stated that he was going to load his wife with diamonds so as to make the "job" look like robbery or an accident. Jo testified that she knew the Shoemakers and knew Talle, having occasionally gone out with him after his divorce from Mary. She remembered a conversation at the Tick Tock Lounge between the Shoemakers and Talle at which she was present. She was most positive that Talle said nothing about killing his wife; that any such testimony that he had so stated in her presence was "absolutely a lie"; that the testimony of Mrs. Shoemaker that she was present at, and participated in, any such conversation was not true, "It is the biggest lie I have ever heard."

In reference to the August, 1948, conversation relating to the $50 bet, Mrs. Shoemaker testified that Joe Pollins, a chauffeur for Talle in 1948, was present and heard the conversation. Pollins admitted being in the Tick Tock Lounge with Talle and the Shoemakers several times in 1948, but was most positive that neither then nor at any other time did he ever hear Talle talk about disposing of his wife, or about hurting her in any way.

Mrs. Shoemaker had testified that Mary Talle had been present at the Brown Palace Hotel conversation when Talle is supposed to have talked about becoming reconciled with Mary. Mary admitted being present at that meeting, and testified that the meeting was called by Talle to discuss a settlement of the financial problems arising out of her divorce decree. She most positively denied that Talle had then

asked her to return to him, and stated that no such conversation had taken place.

Thus, it is fair to say, that in every particular in which Mrs. Shoemaker could have been corroborated as to these conversations, she was specifically repudiated by the other persons she had stated had participated in these conversations.

As already pointed out, the Talles moved to California in the fall of 1947, and settled near Los Gatos. The relationship between appellant and his wife steadily deteriorated. Talle was drinking a great deal at about this time. In the spring of 1948, Marge filed a separate maintenance action. Appellant, however, effected a reconciliation by promising to go to a sanitarium and taking the liquor cure. Appellant did go to this sanitarium and refrained from drinking for about three months after he returned to Los Gatos. During this period the couple got along fairly well, and took several trips together. However, by June of 1948, appellant was drinking heavily again, they separated, and Marge instituted a second separate maintenance action against him. During this period of separation, appellant visited his first wife and his daughter. In September, 1948, Marge and appellant again became reconciled, and took a trip to Honolulu. Shortly after their return, appellant started to drink heavily again. Talle admitted drinking about one-fifth of whisky a day, plus what he drank in various bars that he visited daily, and testified that his daily consumption increased all during 1949. In January of that year the Talles had started to build a new home in Montecito Heights between Saratoga and Los Gatos. During this entire year they quarreled incessantly.

There is considerable evidence of physical violence between the parties during 1947, 1948 and 1949. On several occasions Marge had to have medical care after these encounters, and at least once Talle had several stitches taken in his head after Marge had hit him with a shoe. Most of this testimony as to Marge's injuries came from doctors or friends, the fact that they were caused by appellant being a reasonable inference. On cross-examination Talle admitted causing some of the injuries, but most of the time he could not remember causing them, and in some cases stated that he did not even know that Marge had been suffering from the described injuries.

The Talles moved into their new Montecito home early in December of 1949. Marge was found dead on the patio of this new home on the night of December 23, 1949. She had been shot twice with a .44, admittedly belonging to Talle. The

prosecution fixes the time of death at between 7:45 and 8:30 p. m. of that night.

Talle and Marge had had a disagreement on the night of December 22, 1949, a Thursday. On that day Marge had been shopping with two friends, Sue Rankin and Margaret Wolf. The three women had dinner in town and then drove to the Talle house. Marge asked her friends to come in and see the new house. Talle was then home. While they were looking over the house, Talle asked Marge to come into another room. Then Sue and Margaret heard Talle, in a loud and angry voice, state: "Get your God damn friends out of this house in the middle of the night." There was then a pause and then Talle yelled, "And I'll take care of you later." The two women were scared and ran towards the front of the house, where Marge came to them, and the three then went out to look at the swimming pool. The two women then started to drive away but returned when they saw lights go on in the car port. Marge was there and said "Tommy told me to get the hell out and stay out." Marge then left the premises with her two friends, and spent the night at the home of Margaret Wolf.

We now come to the day of the killing. Marge stayed with Margaret Wolf until about 4 p. m. of December 23, 1949, when she left to catch a bus. While waiting for this bus a friend drove up and offered her a ride. He testified that he picked her up between 4 and 4:30 p. m. and gave her a lift to her home, which was located a substantial distance from the Wolf house. This was the last time that any witness admitted seeing Marge alive. This was between 4:30 and 5 p. m.

What was Talle doing at about this time? He testified that all during the week preceding the killing he was drinking very heavily. He remembers a business conference in an office in Los Gatos on Tuesday, which would have been December 20th, but does not remember ever leaving that office. His activities on Wednesday, Thursday and the fatal Friday, are a complete blank to him—he has no recollection at all.

There seems to be little doubt but that Talle arrived in Los Gatos at about 4 p. m. on December 23, 1949. At that time he showed the effects of having been drinking, but how drunk he was is a matter of dispute. A Mr. Fisk, an employee of the Davenport Electric Company in Los Gatos, and a friend of Talle, testified that Talle came into the store at about 4 p. m., and between then and 7:30 p. m. visited the store some

four or five times. During these visits Talle had obviously been, drinking. Fisk left the store to go home at about 7:30 p. m. and met Talle near the store. Talle, according to Fisk, asked him to have a Christmas drink. The two proceeded to the Manhattan Bar, located across the street, where they had two drinks. Fisk testified that Talle asked him to drive him home, but the witness refused because he was already late. He told Talle to go home in a taxi. Fisk left Talle about 7:45 or 8 p. m.

The evidence as to the whereabouts of Talle between 7:45 or 8 p. m., and about 8:30 p. m., is not very clear. Bosworth, a defense witness, saw Fisk and Talle in the Manhattan Bar, and then the witness went across the street to Angelo's Bar. He saw Talle there about 8:30 p. m. Talle had one of his automobiles in town parked near these bars. It is about 2½ miles from these bars to the Talle house. At least up until the time Fisk left Talle, the appellant was reasonably jovial and there is no evidence that, by his conduct, he indicated any worry or concern.

The next crucial time is about 8:30 p. m., and the scene now shifts to Falashi's Inn, another bar in Los Gatos. At that time and place, Talle knew that his wife was dead and so stated to several persons. How he knew it, does not appear directly in the evidence. No one saw him or his car leave or come back to Los Gatos. No one saw him in his automobile during the critical period. No one saw him near or about his house after 4 p. m. No one saw him other than in Los Gatos during this period.

Johnson, the bartender at Falashi's, who knew Talle because he was a regular customer, testified that Talle came into the bar at about 9 p. m. The bar was crowded, he was busy, and he was not sure of the time and could have been in error as much as 45 minutes either way from 9 p. m. Other credible evidence fixes the time at just before 8:30 p. m. Talle sat on the only vacant bar stool and asked for a drink, but Johnson refused to serve him because he thought that Talle had to drive his car and he could see that Talle was drunk. Talle asked Johnson to make a telephone call for him, but the bartender refused to do so, stating that he was too busy. About this time a Mr. and Mrs. West came into the bar. They knew Talle, saw him there, and exchanged hellos with him. West testified that then he heard Talle mumble something about "his wife being dead," but that he did not pay much attention to it because "it appeared to me like he was intoxicated."

Johnson also heard this mumbling remark about Mrs. Talle's being dead, and at that time, at Talle's request, served him a shot of whisky. A Mr. Todd, another customer in the bar, was sitting several seats away from Talle. He understood Talle to say "something about his wife being shot." West did not hear the word "shot" used. At any rate, Talle then asked West to look up the telephone number of one Van Hecke. West did so, called the number, and handed the telephone to Talle. West did not hear Talle's conversation on the telephone.

Van Hecke, who lives in San Jose, had been a close personal and business friend of Talle for 15 years. He testified that the telephone call came in about 8:30 p.m.; that Talle was agitated and incoherent and asked Van Hecke to come out to Falashi's; that Talle then said something about Margaret's being dead. Van Hecke then drove to Falashi's, a distance of about 13½ miles, and found Talle in the bar. He took Talle out of the bar and finally located Talle's automobile. Talle was quite incoherent and had difficulty walking. Van Hecke drove to the Davenport Electric Company, which he had noticed was still open, and where he was known. He did this, he stated, because Talle had again declared that Marge was dead and wanted Van Hecke to telephone to Boccardo, Talle's attorney. Van Hecke went into the electric store, leaving Talle in the automobile. Van Hecke told Davenport more or less what Talle had told him, and then called Boccardo. This call was made at 9:23 p.m. Van Hecke told the attorney that Talle had stated that his wife was dead and asked Boccardo to come out to see what the "deal" was. Boccardo promised to do so.

After the telephone call had been made, Davenport closed up the store and he and one of his employees, Baumgardner by name, both friends of Talle, went over and got in the back seat of Talle's car. Davenport asked Talle what had happened, stating that Van Hecke had said that Marge was dead. Davenport testified that Talle then said: "Yes, Russ, she is laying out there with a .44 in her," and when Baumgardner expressed disbelief, Talle stated: "Well, a .44 makes an awful big hole." Baumgardner corroborated Davenport. Both Davenport and Baumgardner testified that Talle was very drunk when he made these statements. Van Hecke was then in front of the electric store awaiting the arrival of Boccardo.

When Boccardo arrived, Van Hecke and Boccardo got into Talle's car, conversed for a few moments, and then assisted

Talle into the lawyer's car. The three then drove to the Talle home. Davenport testified that Boccardo had stated that it was best for Davenport and Baumgardner not to get mixed up in the affair, and they stayed in town.

When Boccardo drove up to the Talle house, it was about 10:30 p. m. and the house was in darkness. The lights of the car revealed the dead body of Marge, face down, on the patio. Boccardo went up to the body, felt it, and determined that Marge was dead. In the meantime, Talle and Van Hecke had gone into the house and lit some lights. Boccardo then went into the house looking for a telephone. The telephone had not yet been installed. While walking through a hallway, Van Hecke called Boccardo's attention to a gun lying on the ledge in the living room. Boccardo then told Van Hecke to go into another room and he talked privately to Talle. Nothing was touched or moved. Boccardo testified that they were in the house for but five to ten minutes. The prosecution contends that it was much longer. The three then drove to the Five Spot Bar in Los Gatos looking for a telephone. Boccardo then telephoned the sheriff's office and asked for Deputy Cuffaro, and was told that Cuffaro was at home. Boccardo then telephoned to Cuffaro's home. This call was at 10:53 p. m. Boccardo told Cuffaro that a lady had been shot and that the lady's husband was with him. Cuffaro then came out to the Five Spot. Boccardo walked over to Cuffaro's car and told the deputy sheriff that he had a wealthy client in his car, and that the client's wife was dead at home. Cuffaro asked Boccardo if Talle had done it. Boccardo replied that he did not know, that Talle had been drinking a lot and was incoherent. He told Cuffaro that he had already advised Talle not to talk. The four men then drove out to the Talle house, where Boccardo and Cuffaro entered. Boccardo pointed out to the deputy a lead pellet on the hallway floor and bullet marks on the wall. Cuffaro then noticed the gun, picked it up, and observed that there were two empty cartridges in the gun. Boccardo observed that ''we can assume that it is logically his.'' A holster for the gun was found in the bedroom. Boccardo then asked Cuffaro, who had in the meantime contacted the sheriff's office by radio, whether he wanted to take Talle into custody. Cuffaro told Boccardo for him to keep Talle until he heard from the sheriff's office. Boccardo, Talle and Van Hecke then left. Cuffaro searched the premises and found another gun, a .32 pistol, fully loaded, in a desk drawer.

In the meantime, the lawyer had taken Talle to the Boccardo residence. He immediately called Menard, the district attorney, told him that somebody had been killed or shot, and that he had the husband at his home. By agreement with Menard, Boccardo then took Talle to a hotel, having promised Menard that Tallee would be available upon demand. Talle was taken into custody about 2:20 a. m. on December 24, 1949. He then or thereafter, on advice of his attorney, refused to talk to the arresting or any other officer or law enforcement official.

The pistol found in the living room was the death weapon. It was a .44 belonging to Talle, his father having given it to him some 15 years previously. Talle testified that he had never shot it in all that time. There were no fingerprints on the gun, it being covered with a film of oil that prevented fingerprints from forming. Marge had been shot twice, once in the breast and once in the arm, which shot went into her chest. A criminologist testified that the breast shot was fired at a distance of 19 to 21 inches, while the gun was but 9 to 11 inches from the arm when that shot was fired. No tests were made on Talle to ascertain whether he had recently fired a gun, an expert testifying that such a test would have been ineffectual when he first saw Talle.

There were two small blood stains on Talle's trousers, one on the inside of the right leg, and the other near the crease. It was human blood type "O," the same type as that of Marge and of Talle.

This is a rough outline of the evidence. The record shows that the trial was conducted in a highly emotional atmosphere. The prosecuting attorneys attempted to appeal to the passion and prejudice of the jury by constant reference to appellant's wealth, by vilification of defense and adverse witnesses, by vilification of defense counsel, by constant and repeated reference to the fact that one defense counsel had been brought from San Francisco, charging broadly that anyone who would hire this attorney must be guilty, and by constant reference to the fact that Talle had refused to talk to the district attorney, the other law enforcement officers, or to the grand jury, charging that this demonstrated his guilt.

The tone of the trial was set by the prosecution at its inception. After the jury had been selected, the district attorney stated that during the examination of the jurors "there have been a number of statements made concerning the advantage that is gained by the prosecution in the fact of being permitted to proceed, that the defendant is not permitted to present any

.of his defense until after the prosecution has completed its case. In order to share that advantage, if it is thought to be such, at this time, we wish to call as our witness the defendant, Thomas P. Talle." Counsel for defendant immediately objected, whereupon the court stated: "I am going to advise him of his rights. Mr. Talle, you don't have to take the stand, regardless of anything, and you don't even have to be sworn, that is your right. Do you want to take the stand? Defendant: I'd rather not be sworn. The Court: Do you want to take the stand? Defendant: No, sir. The Court: You do not? Defendant: No."

This was a direct, deliberate and prejudical impairment of appellant's fundamental and constitutional rights. The only purpose of this maneuver was, at the inception of the trial, to try to impair the presumption of innocence that clothes all accused until proven guilty, and to violate appellant's constitutional guarantee against self-incrimination. This error was aggravated and compounded when the district attorney, on the cross-examination of Talle, after he had taken the stand in his own defense, was permitted to ask Talle time and time again why he had refused to take the stand as the first witness when called, and why he had then insisted on invoking his constitutional rights. Over the vigorous and proper objections of defense counsel, Talle was compelled to answer these questions and was compelled to state that he had refused to then take the stand on the advice of his attorneys. It is a novel, and certainly unsound, principle of law that a defendant must justify and explain why he has taken advantage of his constitutional rights.

This error became demonstrably prejudicial when the district attorney was permitted, in his closing argument to the jury, to comment on this subject at length. He first stated that, in his opinion, defendants in criminal cases have too many rights, that "I don't think that any defendant should have a right to hire gentlemen with money to come in and help them, even if they come from San Francisco. . . . I do think defendants have too many rights." Having thus implanted in the mind of the jury the thought that defendants have too many rights, a short time later the district attorney was permitted to argue as follows:

"Who was the first person that we called to the witness stand, who was the first person we asked to tell his story? Why, Thomas P. Talle. You remember that, don't you?

"He stood up, and can't you picture his reaction. 'Ye Gods,

here for months I've been told not to talk, ———' by his lawyers, by 'the best lawyers in the United States,———not to talk, and now I'm being called to the witness stand to tell my story. Ye Gods, what do I do, what do I say?' What consternation, ———what a shock.

"And even the gentleman from San Francisco didn't know what to do or say. Completely flabbergasted. Can't you see the reaction in his mind? 'Ye Gods, here for three days I've been telling those good people on the jury they must withhold their judgment, we don't get to tell our side until after the prosecution is finished, and now they're inviting my client to take the stand, they want him to tell his story. Ye Gods, what do I do now? What do I say?'" The district attorney then went on to argue that counsel for appellant in advising Talle not to then testify did so because Talle "doesn't know what to say yet. If he did he wouldn't have a chance. 'We have to wait and see what is on the other side, then after that we will decide whether he is going to take the stand or not.' And so again, Talle refuses to talk even to you."

Thus, the district attorney was permitted to argue that refusing to be sworn as the first witness was evidence that defendant's defense was manufactured.

Respondent seeks judicial approval of these tactics with the argument that a defendant in a criminal case is a person, and if he is able to observe, recollect and narrate he is competent as a witness just as all other persons are, the only difference between him and other persons being that a defendant does not have to be sworn to take advantage of his constitutional rights while a witness must be sworn. █ There can be no doubt but that it was highly improper and prejudicial for the district attorney to cross-examine appellant and to comment upon his failure to testify, before a prima facie case had been established against him by the prosecution.

Article 1, section 13, of the Constitution, so far as pertinent here, reads: "No person shall be twice put in jeopardy for the same offense; nor be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; but in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by

the court and by counsel, and may be considered by the court or the jury.''

This same thought with the same limitations is expressed in section 1323 of the Penal Code as follows: ''A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. The failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by counsel.''

Section 688 of the Penal Code provides: ''No person can be compelled, in a criminal action, to be a witness against himself; nor can a person charged with a public offense be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge.''

It will be noted that under these constitutional and statutory provisions the right of the defendant to remain silent is absolute except that the prosecution may comment if the defendant fails ''to explain or to deny by his testimony any evidence or facts *in the case against him.*'' Thus, by express constitutional and statutory limitation comment is allowed only when the prosecution has first made out a case that the accused can or should deny. At the inception of the case, obviously, the prosecution has developed no facts at all that the accused can deny. As was said in *People* v. *Sawaya,* 46 Cal.App.2d 466, 471 [115 P.2d 1001]: ''The fact that the constitutional provision provides that in a criminal case, whether or not the defendant testifies, his failure to explain or deny by his testimony any evidence or facts in the case against him may be commented upon by the court or counsel and may be considered by the court or the jury, does not deprive a defendant of his right to stand mute, nor does it relieve the prosecution of the burden of establishing his guilt beyond a reasonable doubt, and by competent and legal evidence.''

Under a proper interpretation of these quoted provisions, an accused has the right to stand mute, clothed in the presumption of innocence, until the prosecution, at the trial, has made out a prima facie case against him. Until that has been done, it is improper to even comment on his silence.

It is also perfectly clear that, unless a defendant requests the privilege of testifying, he is incompetent as a witness, and that the prosecution has no legal right to

ask him to testify. In this state there is an express statute that provides that those accused of crime are competent as witnesses only at their own request and not otherwise. This statute was first passed in 1865. (Stats. 1865-1866, p. 865, ch. DCXLIV.) As then passed, it was in two sections. In 1872, section one was amended. (Stats. 1871-1872, p. 319, ch. CCXLIII.) As then amended, and as it now reads, that section provides: "In the trial of or examination upon all indictments, complaints, and other proceedings before any Court, Magistrate, Grand Jury, or other tribunal, against persons accused or charged with the commission of crimes or offenses, the person so accused or charged shall, at his own request, but not otherwise, be deemed a competent witness; the credit to be given to his testimony being left solely to the jury, under the instructions of the Court, or to the discrimination of the Magistrate, Grand Jury, or other tribunal before which such testimony may be given."

Section two as originally enacted, and as it now reads, provides: "Nothing herein contained shall be construed as compelling any such person to testify."

This statute (not mentioned by the parties to this appeal) is conclusive on the point under discussion. It has never been repealed. It cannot be contended that it was repealed by implication by the adoption of the Penal Code. This is so for two reasons. The Penal Code was approved on February 14, 1872, while the amendment here under consideration was approved on March 11, 1872. That is a relevant factor. In the second place, former Political Code section 4479, also passed in 1872 and now, since 1951, section 23.1 of the Civil Code, provides that laws inconsistent with the codes passed at the 1872 session prevail over the codes. (See 23 Cal.Jur. p. 709, § 93.)

This type of statute is common to the federal government and to many states. The purpose of such statutes was to abrogate, in criminal cases, the original common law rule that made the accused incompetent as a witness even on his own behalf. (8 Wigmore on Evidence (3d ed.), p. 392; *People v. Tyler*, 36 Cal. 522.) The statute renders such accused person competent only "at his own request." Thus, there is a specific provision of law making the accused competent only at his own request and necessarily incompetent otherwise. ■ This statutory provision, of course, since it is specific, controls the general competency sections of the Penal Code and the Code of Civil Procedure. (Pen. Code, § 1321;

Code Civ. Proc., §§ 1879, 1880.) It should be noted that these sections were all adopted in 1872, and if there is any inconsistency between them and the statute under consid- eration, then the statute, under section 23.1 of the Civil Code, would control. Section 1321 of the Penal Code and section 1879 of the Code of Civil Procedure have remained unamended since 1872. While section 1880 of the Code of Civil Procedure was amended in 1873 and again in 1880, these amendments did not affect the portions of the section here involved. These amendments, therefore, do not make section 1880, so far as pertinent here, later in point of time to the statute. (Gov. Code, § 9605.)

Professor Wigmore interprets statutes such as the 1865-1872 one here involved as forbidding the calling of the accused by the prosecution. He states (vol. 8, 3d ed., p. 393): "By the express tenor, in most jurisdictions, of the statute qualifying the accused, he is declared to be a competent witness 'at his own request, but not otherwise' . . . Whether this form of words was chosen with a view to its present bearing can only be surmised; but its evident effect is to forbid the calling of the accused by the prosecution." (See, also, 3 Wharton, Criminal Evidence (11th ed.), p. 1960.)

The cases bear out these conclusions. *City of Philadelphia v. Cline*, 158 Pa.Super. 179 [44 A.2d 610], is directly in point. There, in a tax proceeding, criminal in nature, the defendants were called as witnesses for the state and required to give their names and addresses, further questioning being halted upon the claiming of the privilege. This was held to be reversible error. At page 613 [44 A.2d] the court stated: "In those cases where a defendant has a privilege to refuse to testify, it is error to call upon him to take the stand in the presence of the jury and require him to claim his constitutional safeguards, as the refusal to answer is an eloquent incriminatory act and the spectacle produced, if permitted, would effectually emasculate the time-honored principles extending the haven of silence to one who may by the outcome of litigation be subjected to the imposition of a fine or forfeiture."

There is language in several other cases to the same effect. In *United States* v. *Housing Foundation of America*, 176 F.2d 665, it was held reversible error for one defendant to call another codefendant to the stand. The trial court, over objection, first permitted the evidence, but later, on motion, it was stricken, and a full and complete cautionary instruc-

tion given. Nevertheless, the error was held prejudicial. Judge Goodrich, speaking for the court, stated (p. 666): "Compelling the defendant Westfield to take the stand and to testify in a criminal prosecution against him is so fundamental an error that the judgment must be reversed and a new trial ordered as to Westfield. The error made arises from confusing the privilege of any witness not to give incriminating answers with the right of the accused not to take the stand in a criminal prosecution against him. Both come within the protection of the clause of the 5th Amendment which provides: 'No person . . . shall be compelled in any criminal case to be a witness against himself.' The plain difference between the privilege of witness and accused is that the latter may not be required to take the stand at all. We need only say in this case that the accused was required to take the stand and to testify over his objection and in violation of his right protected both by the Constitution and the common law." (See, also, *People* v. *Yeager,* 194 Cal. 452, 488 [229 P. 40].)

In *Wolfson* v. *United States,* 101 F. 430, 436 [41 C.C.A. 422], the Circuit Court, in commenting on a statute that provided that the accused "at his own request but not otherwise" shall "be a competent witness," stated: "It would clearly be improper for the government, while he was on trial, in the absence of a request on his part, to call him as a witness. The purpose of the law was to make defendants competent witnesses, but at the same time preserve to them the right to remain silent without prejudice." This case was quoted with approval in *Brown* v. *United States,* 56 F.2d 997. (See, also, *State* v. *Sly,* 63 S.D. 162 [257 N.W. 113]; *State* v. *Smith,* 56 S.D. 238 [228 N.W. 240]; *Sprague* v. *State,* 203 Ind. 581 [181 N.E. 507]; *Gillespie* v. *State,* 5 Okla. Crim. 546 [115 P. 620, 35 L.R.A.N.S. 1171, Ann.Cas. 1912D 259]; *State* v. *Hollingsworth,* 191 N.C. 595 [132 S.E. 667]; *Commonwealth* v. *Valeroso,* 273 Pa. 213 [116 A. 828]; *McKnight* v. *United States,* 115 F. 972 [54 C.C.A. 358].)

These errors in calling the appellant as a witness, in permitting the district attorney to cross-examine appellant as to his reasons for then refusing to testify, and the highly improper argument made to the jury in commenting on this incident, constituted a flagrant, shocking and prejudicial invasion of appellant's constitutional rights. It constituted a calculated and premeditated attempt to create in the minds of the jurors the idea that by refusing to then testify defend-

ant necessarily admitted his guilt, or wanted to manufacture his defense. The presumption of innocence to which appellant was entitled was thus effectually removed from the case.

This error *alone* would require a reversal. However, there were other serious and prejudicial errors committed. One of these involved a typewritten statement prepared by the deceased four months prior to her death which was offered by the prosecution as part of its case in chief, and which was admitted, over the objections of the defense. This got into the record through the testimony of an attorney, Elmer Jensen. Sometime in 1948 Marge consulted Jensen in reference to one of her actions for separate maintenance. In 1949 Jensen asked her to prepare "a statement giving me her story of her life with Tom Talle" to aid him in the preparation of the case. Marge prepared and delivered this statement to Jensen in August, 1949. This statement is typed, is unsigned, consists of seven single-spaced pages, of varying length, and was handed to Jensen in an envelope. According to Jensen, when this statement was delivered to him, Marge directed "In case anything happens to me turn this envelope over to the District Attorney."

This statement was admitted into evidence as part of the prosecution's case in chief. The statement purports to give a history, from Marge's standpoint, of her life with appellant. There are references to several occasions when Marge states that appellant used physical force against her. She charges that he pointed a gun at her; once put her out of their automobile in the rain; offered her $10,000 to give him a divorce. The letter refers to Marge's belief that Talle was in contact with his first wife, Mary, and charges that he asked her, Marge, for a divorce. It charges that Talle accused her of marrying him for his money. It also states that Mrs. Shoemaker had told Marge that Talle had threatened that he was going to kill her. It charges that Talle had told several people that he wanted to divorce Marge so that he could remarry his first wife, Mary. It charges that Talle was tight with his money, etc., etc.

The statement is obviously hearsay, and, in some respects, hearsay on hearsay. No contention is or can be made that it was admissible as a dying declaration, or as evidence of any of the past acts therein referred to. It was the theory of the prosecution that it was admissible for the purpose of showing the state of mind of the deceased. The trial judge

admitted it for this limited purpose, and, before it was read to the jury, instructed that it was to be considered for this limited purpose, and repeated this limitation in his final instructions. Thereafter, it was read to the jury, and, in whole or in part, reread to the jury several times. It was repeatedly referred to in the arguments to the jury. Time and time again the district attorney, in spite of the limitations placed on this evidence by the trial court, used the statement as if it were evidence of the facts recited, and used it as if it were evidence of motive, intent and premeditation.

It is too clear to require extended discussion that the statement was hearsay, and not admissible to show state of mind of the deceased, or for any other purpose. It was, of course, a self-serving document prepared by the deceased purporting to recount past events, and giving her side of the story in reference to her marital difficulties, for the purpose of aiding her in the separate maintenance action then pending. The state of mind of the deceased was never an issue in the case. The defense was that appellant did not commit the crime, and that he was so drunk that he could not remember anything that happened the day that his wife was killed. At the time the evidence was introduced, there was no claim of self-defense or that deceased had quarreled with or provoked Talle. There was no claim of suicide. Respondent points out that some mention of such possible defenses was made on the *voir dire* examination of the jury, but it is obvious that what was then said did not put into issue the state of mind of the deceased four months before she was killed. There is not one word in the transcript that during the trial appellant relied upon self-defense or suicide or provocation.

Respondent also claims that "state of mind" was in issue because the defense introduced into evidence the separate maintenance complaints, and on the cross-examination of Boccardo, was permitted to give the contents of a conversation between Boccardo and Van Hecke while they were waiting in the automobile for Cuffaro. In that conversation, first referred to by the prosecution on its direct examination of Boccardo, Van Hecke is supposed to have told Boccardo that Marge Talle was quarrelsome and a very unpleasant person. This testimony did not put the state of mind of the deceased into issue so as to warrant the introduction of such a document.

A leading case on this subject is *Shepard* v. *United States,* 290 U.S. 96 [54 S.Ct. 22, 78 L.Ed. 196]. The defendant there was convicted of murdering his wife. There was admitted into evidence a statement made by the wife at a time she was ill but did not know she was dying that "Dr. Shepard has poisoned me." This statement was made on May 22, 1929, and the wife died on June 15, 1929. The statement was admitted as a dying declaration. Mr. Justice Cardozo pointed out that, for many reasons, the statement did not qualify as a dying declaration. The court then discussed the possibility of the statement's being admissible on other grounds, the Circuit Court having held that it was admissible to show state of mind. Defendant had introduced declarations of the deceased that she was contemplating suicide. The Supreme Court first pointed out that the evidence was not admitted on such limited ground, but then went on to indicate that it was not admissible even on that limited ground—"the accusatory declaration must have been rejected as evidence of a state of mind, though the purpose thus to limit it had been brought to light upon the trial." (P. 103.) In the course of its discussion the court stated: "It will not do to say that the jury might accept the declarations for any light that they may cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. . . . When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." (P. 104.) The court then pointed out instances where state of mind may be in issue, and then concluded: "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

"The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury." (P. 105.)

Everything said in the Shepard case is here applicable. Here was a voice from the grave charging appellant with

past acts of brutality and cruelty, and charging that he had made threats against his wife's life. How could the jury possibly disentangle the charges in that letter and treat the letter only as evidence of state of mind, and forget about the substance of the charges? How could the defendant meet such a situation? He could not cross-examine the deceased. Her lips were sealed. Here was a self-serving statement prepared for a partisan purpose against which the accused was powerless to defend. It will not do to say that it was admitted for the limited purpose of showing state of mind of the deceased, and, even if erroneously admitted, could not be prejudicial. ▆ To be admissible, even when state of mind is in issue (which it was not), the statement must be made under circumstances so as to make it reasonably certain it was not the result of a partisan premeditated plan to accuse. That did not exist here.

▆ The district attorney referred to this letter of the deceased in his opening statement. He read and reread the letter to the jury, in whole or in part, several times during the trial. During the arguments to the jury it was read and reread, in whole or in part, time and time again. Although the district attorney would occasionally state, or the court would state, that the letter was admitted solely on the issue of the state of mind of the deceased, time and again it was argued that the letter corroborated Mrs. Shoemaker, or was evidence of motive, premeditation or intent. If the district attorney could not limit the letter to the limited purpose fixed by the court, how was the jury to accomplish that almost impossible feat?

▆ Nor can it properly be argued that the error in admitting this testimony was nonprejudicial because it was "merely" cumulative. It is argued that some of the damaging statements in the letter were testified to by other witnesses, including the defendant, and that the most damaging threats were testified to by Mrs. Shoemaker. It is true that Mrs. Shoemaker testified as to these threats, but it is equally true, as already pointed out, that Mrs. Shoemaker was contradicted by five witnesses. Her credibility was one of the crucial issues in the case. If the letter of Mrs. Talle was not admissible, and we have held that it was not, the fact that Mrs. Shoemaker testified to some of the matters contained therein would not render its admission nonprejudicial where Mrs. Shoemaker's credibility was involved. It would be a strange doctrine of law to hold that the introduction

of such a letter was error but not prejudicial because another witness testified to the same facts, and then argue that this other witness, whose credibility had been attacked, was corroborated by the inadmissible letter. That is not the law.

Somewhat the same situation exists as to 10 so-called love letters written by Marge to Talle while he was in the sanitarium taking the liquor cure. These letters professed great love on the part of Marge for Talle at the time they were written, and pictured her home life while Talle was away. They were extremely damaging to the defense. These letters were also admitted on the prosecution's case in chief for the purpose of showing Marge's state of mind, and were read to the jury. It is argued that the letters were admissible to show the character of the deceased. ■ Of course evidence of character is admissible only when the character of the deceased is in issue. (*People* v. *Hoffman*, 195 Cal. 295 [232 P. 974]; *People* v. *Fitch*, 28 Cal.App.2d 31 [81 P.2d 1019].) The Fitch case well illustrates the extent and limitations on that rule. There the defendant had placed the character of the decedent in reference to peaceableness in issue by a plea of self-defense. That was not this case. These letters were admitted as part of the prosecution's case in chief. Self-defense or suicide was not involved. The testimony of Boccardo giving the balance of the conversation with Van Hecke first referred to on direct, as already pointed out, did not put in issue the character of the deceased. The initial evidence as to this conversation was first brought into the case by the prosecution's own witness on direct examination, and the fact that Boccardo, who was also the attorney for Talle, happened to be this witness, does not change the legal situation.

Many other contentions are made by appellant. It is charged that the prosecution was improperly permitted to impeach its own witnesses under the guise of "refreshing" recollection (see *People* v. *Zammora*, 66 Cal.App.2d 166 [152 P.2d 180]; *People* v. *Flores*, 37 Cal.App.2d 282 [99 P.2d 326]; *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618]); that such impeaching testimony was thereafter used by the prosecution as substantive evidence of appellant's guilt; that several instructions were erroneous; that the foreman of the jury was guilty of misconduct in that he intimidated a juror, etc., etc. In connection with using impeachment evidence as substantive evidence, the respondent admits that when the district attorney argued that Van Hecke had testified that

Talle had admitted that he shot his wife and admitted his guilt, he was in error in that such admissions only appear (and then only in part) in impeaching testimony. It is not necessary to consider all of these claimed errors in this opinion, inasmuch as the errors already mentioned require a reversal.

However, there is one other claimed error that should be discussed. ▮ It is urged that in many respects the district attorney was guilty of misconduct and prejudicial error in his final argument to the jury. With this contention we agree. A reading of that argument, which covers nearly 200 pages of the reporter's transcript, demonstrates that it was highly inflammatory and improper in many respects. It cannot be urged that any of these remarks were called forth by the arguments of the defense, because such arguments were not transcribed and are not before us. (*People* v. *Hidalgo,* 78 Cal.App.2d 926 [179 P.2d 102].)

The argument is much too long to refer to in detail, but a few references will serve to show its tone. Time and time again the district attorney broadly implied, and occasionally stated, that he knew that Talle was guilty, and at least once stated: "God knows that Talle is guilty." He told the jury that in the discharge of his official duties he had undertaken the prosecution of Talle "to avenge the cruel death of an innocent girl at the hands of a man whom society now regards not as a man but as a beast"; that the deceased had "put up with a beast like Talle for four years," and referred to the "despicable character of the beast at the bar," and as the "criminal" that was before the court. He spent considerable time in pointing out that his associate deputy was only paid to work forty hours a week, but had voluntarily worked one hundred hours a week for five months in collecting the evidence in this case. He referred to the many extra hours put in by the sheriff's office and by various police officers and other officials and employees in working up the prosecution's case that had, so he said, to meet every conceivable defense that might, he implied, be manufactured. He several times invited the members of the jury to come to his office after the case was over to see the results of this vast amount of work, pointing out that all the jurors saw was what happened in court, but "There is a lot that you didn't see." Then he broadly implied that much evidence had been collected that tended to show appellant's guilt that he would

show them when the case was over. This was palpably erroneous and prejudicial.

From the beginning of his argument to its end he constantly referred to the "great" wealth of the defendant, charged that you could not convict a man with money, stated that it was up to the jury to prove that you could convict a man with money, and implied that if a verdict less than murder were brought in that would demonstrate that a guilty rich man could not be convicted.

A bitter attack was made on Attorney Davis, because, apparently, he had been brought in from San Francisco. Time and time again the fact that Davis had been brought in from San Francisco was referred to, and it was stated that if Davis ever came back to Santa Clara County to defend a man accused of crime "there will be three hundred thousand people in our County who will know that we've got another guy just as guilty as Talle, and will know it from no other reason than because Mr. Davis is down here to defend him." Davis was referred to as a "hireling" who would do anything for money, as "just a liar," and as one lacking in "manhood."

An even more bitter attack was made against Attorney Boccardo. He was charged with being a hireling for money, a concealer of evidence, as a deceiver of the jury, and as one not fit to practice law. It was charged that he advised Talle not to talk so that he could earn more money in defending the case, that he concealed evidence by telling Talle not to talk, that Boccardo "did wrong, there is no question but what he violated the law," that Talle had confessed to Boccardo that he had shot his wife and that Boccardo concealed that from the jury. At one place the district attorney stated: "Yes, Jim [Boccardo], if Talle and his money hadn't counted so much with you, you would not be in the position of disgrace that you now occupy," and again referred to Boccardo as being "a paid defender of a brutal murderer." The district attorney charged that Boccardo had "forgotten completely the ideals that stand out as glistening standards of conduct for a noble profession, and stooped to conduct no lawyer in the world would even want to admit," and that money had caused Boccardo to stoop to conduct so low. He then stated: "Why Mr. Boccardo ever imported him [Davis] from San Francisco is completely beyond my understanding, unless it should be that not one single lawyer out of two hundred lawyers in Santa Clara County would have anything

to do with this case. . . . Certainly, you ought to know the things that have gone on here aren't the conduct of reputable attorneys. . . .''

The district attorney, simply because they gave testimony adverse to the prosecution, bitterly assailed every important defense witness, and some prosecution witnesses, as being ''no good'' and as having been ''corrupted'' by Talle's money. He charged that the experts produced by the defense were guilty of fraud, deception and corruption, and were mere ''hirelings'' brought in to deceive the jury. A virulent attack was made on the prosecution witness Van Hecke. It was charged that his testimony was a ''pack of lies,'' and ''I say that man is a despicable character, that man is an insult to American manhood.'' And again: ''I'll tell you, it would be very hard to control yourself with a guy like that. Can't you see the despicable character of the man—just jumping out all over him.'' Reference has already been made to the fact that respondent concedes that the district attorney was guilty of error in time and again stating as a fact that Talle had stated to Van Hecke that he had shot his wife, thus using material as substantive evidence that appeared only in impeaching testimony. Reference has already been made to the misuse of the Jensen letter, and its use by the district attorney as direct evidence of the facts contained therein when it had been admitted for no such purpose.

The district attorney stated that, had Jensen been that kind of a man, he could have been bribed by Talle or by his attorney to destroy the damaging letter. He stated that, because of his scientific knowledge, he could tell the jury exactly what happened before, during and after the crime. He then purported to tell the jury what had happened at the Talle home on the night of December 23, 1949. He purported to recount the facts, including conversations between Talle and Boccardo, and Talle and Van Hecke. In these conversations he charged, time and time again, that Talle had confessed to Boccardo and Van Hecke. There was no evidence to sustain this fanciful theory.

The basic theme of the argument was that because, on advice of counsel, Talle refused to talk when arrested, refused to talk to the sheriff and his deputies, refused to talk to the district attorney, refused to testify before the grand jury, and refused to testify as a prosecution witness, he was necessarily guilty and the jury should so find, because no innocent man would thus refuse to talk. Talle had a consti-

tutional right to refuse to talk. Under the constitutional amendment, the prosecution, as already pointed out, may comment on the failure of the accused "to explain or to deny by his testimony any evidence or facts in the case against him," but that right is limited to comment after a prima facie case has been established at the trial. Until then the accused has a right to remain silent on the advice of counsel, and such silence cannot be used as an admission of guilt. The prosecution cannot build up a case against an accused by sending various officials to talk to him, or by writing him letters, and then use his silence, based on advice of counsel, as an admission of guilt. Those accused of crime are not required to cooperate with the prosecution. The prosecution has the duty of proving that the accused is guilty beyond a reasonable doubt, and until that is done, the accused may remain silent. It was highly improper and prejudicial to charge that his silence, under the circumstances, constituted an admission of guilt.

That many portions of this argument were improper and prejudicial is too clear to require extended discussion. Most of this argument was made over the prompt and proper objections of the defense. Most of these objections were overruled. On the few occasions that objections were sustained the district attorney, a few moments later, would continue the argument along the same lines. On only a very few occasions was the jury instructed to disregard the improper argument. On most occasions the trial court stated to the defense "you have your exception," or to the district attorney "Proceed."

 It hardly needs citation of authority that an argument by the prosecution that appeals to the passion or prejudice of the jury, that asks for a verdict of guilty because of sympathy for the deceased, that repeatedly characterizes the defendant as a "despicable beast," that throws the dignity and prestige of the district attorney's office behind a personal assertion in the belief of the guilt of the accused, that avers that defendants have too many rights, that villifies, without warrant, defense counsel and defense witnesses, that engages in fanciful inferences, not warranted by the evidence, and makes them as statements of fact not warranted by the record, that misstates the record, that uses evidence admitted for a limited purpose as substantive evidence of the facts there recited, that broadly implies the prosecution is possessed of much evidence tending to show guilt that has

not been introduced, is erroneous and prejudicial. (*People v. Henderson*, 4 Cal.2d 188 [48 P.2d 17]; *People v. Ford*, 89 Cal.App.2d 467 [200 P.2d 867]; *People v. Podwys*, 6 Cal. App.2d 71 [44 P.2d 377]; *People v. Edgar*, 34 Cal.App. 459 [167 P. 891]; *People v. Hidalgo*, 78 Cal.App.2d 926 [179 P.2d 102]; *People v. Brown*, 81 Cal.App. 226 [253 P. 735]; *People v. Hale*, 82 Cal.App.2d 827 [187 P.2d 121]; *People v. Devine*, 95 Cal. 227 [30 P. 378]; *People v. Braun*, 14 Cal.2d 1 [92 P.2d 402]; *People v. Angelopoulos*, 30 Cal.App.2d 538 [86 P.2d 873]; *People v. Freitas*, 34 Cal.App.2d 684 [94 P.2d 397]; *People v. Duvernay*, 43 Cal.App.2d 823 [111 P.2d 659]; *People v. Wynn*, 44 Cal.App.2d 723 [112 P.2d 979]; *People v. Lynch*, 60 Cal.App.2d 133 [140 P.2d 418]; *People v. Williams*, 104 Cal.App.2d 323 [231 P.2d 554].).

Of course, many of the cases cited above can be distinguished from the instant one on their facts, but they all stand for the fundamental principle that prosecuting attorneys will be restrained if their actions deprive the accused of a fair trial. They all stand for the proposition that such conduct, in a case where the issue of guilt is debatable, is prejudicial and requires a reversal.

The argument of the district attorney, particularly his closing argument, comes from an official representative of the People. As such, it does, and it should, carry great weight. It must, therefore, be reasonably objective. It is no answer to state that defense counsel also used questionable tactics during the trial and therefore the district attorney was entitled to retaliate. Defense counsel and the prosecuting officials do not stand as equals before the jury. Defense counsel are known to be advocates for the defense. The prosecuting attorneys are government officials and clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige. It is their duty to see to it that those accused of crime are afforded a fair trial. The applicable rule was admirably stated in *Berger v. United States*, 295 U.S. 78, 88 [55 S.Ct. 629, 79 L.Ed. 1314], quoted with approval in *Viereck v. United States*, 318 U.S. 236, 248 [63 S.Ct. 561, 87 L.Ed. 734]: " 'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very

definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' ''

District attorneys are, of course, to be commended for investigating crime and in prosecuting, with vigor, those accused of crime. But prosecutive zeal and honesty in belief of guilt are not a substitute for the orderly, lawful and constitutional processes and guarantees. The law, in its wisdom, has seen fit to surround those accused of crime with certain rights and privileges. Among them are the privilege against self-incrimination, the presumption of innocence, the right of the accused to remain silent on advice of counsel, and the right not to be found guilty except upon a finding of a jury that the offense has been proved beyond a reasonable doubt. Prosecuting officials have no right to weaken these and other protective constitutional devices. No doubt some prosecuting officials feel restive because of the necessity of proceeding step by step in the manner provided by law in the handling of prosecutions, and seek to substitute their fixed belief in the guilt of the accused for the proof required by law. Prosecuting those accused of crime is often a tedious and tiresome process. But this is the process required by law, and short cuts cannot be tolerated. Constitutional guarantees are not arbitrary pronouncements adopted to protect the guilty, and to make it difficult for sincere hardworking prosecutors. They are the result of hundreds of years of struggle in fighting governmental oppression. They are necessary to protect the innocent. If an accused, even a guilty accused, cannot be convicted except by a violation of these principles, then he should not and cannot be lawfully convicted. It would be a sad day for the administration of justice if this court were to condone the substitution of the personal beliefs of the district attorney that defendants have too many rights, and that the accused should be convicted because the district attorney thinks he should, for what the law guarantees—a fair jury trial. District attorneys are not the arbiters of guilt or innocence. A guilty man, even a wealthy guilty man, is as much entitled to a fair trial as an innocent one. If a con-

viction is secured by means not sanctioned by law, the conviction cannot and should not stand.

Talle may be guilty. That we do not know. As already pointed out, there was sufficient evidence, if believed, to sustain a conviction. But the case is entirely circumstantial. An innocent verdict would also be supported. Under such circumstances, inasmuch as the record demonstrates, for the many reasons already set forth, that Talle was not afforded a fair trial, and that his constitutional guarantees and rights were trampled upon, and disregarded, it must be held that the errors are of such a nature that article VI, section $4\frac{1}{2}$, of the Constitution cannot save the conviction.

The judgment and order appealed from are reversed, and a new trial ordered.

Bray, J., and Wood (Fred B.), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 10, 1952.